587 A.2d 531

**MCIC, INC., et al.**

v.

**William ZENOBIA, Sr., et al.**

No. 1580, Sept. Term, 1989.

Court of Special Appeals of Maryland.

March 27, 1991.

460

Patrick C. Smith (Laura B. Black, Gardner M. Duvall and Whiteford, Taylor & Preston, on the brief), Baltimore, for appellant, Porter Hayden Co.

Lee Baylin (John G. Sakellaris, Gregory G. Broikos and Bernstein, Sakellaris & Ward, on the brief), Baltimore, for appellant, Anchor Packing Co.

John J. Nagle, III, Ann M. Potthast and Power & Mosner, P.A., on the brief, Towson, for appellant, MCIC, Inc.

H. Barnes Mowell and Mann & Whelley, on the brief, Towson, for appellant, Eagle–Picher.

Clifford W. Cuniff, Baltimore (James J. Pettit, Michael A. Galpern and Greitzer and Locks, on the brief), Louis Dickerson, Philadelphia, Pa., for appellee/cross-appellant.

Argued before MOYLAN, GARRITY and JAMES S. GETTY (Retired, Specially Assigned), JJ.

JAMES S. GETTY, Judge.

This products liability case consolidated for trial the claims of Louis L. Dickerson and William L. Zenobia, who allege that they contracted asbestosis as a result of their exposure to products containing asbestos which were either manufactured or supplied by the named defendants herein. At trial in the Circuit Court for Baltimore City (Hubbard, J.), the case proceeded before a jury on the theory of strict liability.

The defendants in Dickerson's case are Owens–Illinois, Inc., Eagle–Picher, and Celotex Corp., all manufacturers, and MCIC, Inc., and Porter Hayden Company, both suppliers of asbestos products. The defendants in Zenobia's case include Owens–Illinois, MCIC, Porter Hayden and an additional supplier, Anchor Packing Company.

Other named defendants settled with both plaintiffs at different stages of the trial and became the target of cross-claims for contribution by the above-named original defendants. Included in the settling category are Raymark Industries, Inc., which settled with both Dickerson and Zenobia before trial, and the following defendants, who settled during trial: Armstrong World Industries, GAF Corporation, AC & S, Inc., and Owens–Corning Fiberglass settled with Dickerson; Owens Corning was stricken from the Zenobia case and the above-named companies remaining also settled with Zenobia.

Trial began on November 21, 1988, and culminated in a jury verdict on January 19, 1989, awarding Dickerson compensatory damages against all five defendants in the amount of $1,300,000.00 and further allotted Zenobia the sum of $1,200,000.00, assessed against the four defendants in his case.

The jury also decided that punitive damages were warranted against Owens–Illinois, Porter Hayden and Celotex. At a subsequent hearing, punitive damages were awarded Dickerson against Owens–Illinois in the amount of $235,-000.00; against Porter Hayden in the amount of $2,500.00; and against Celotex in the amount of $372,000.00. In Zenobia's case he was accorded the identical amounts charged to Owens–Illinois and to Porter Hayden.

All post trial motions were denied by the trial court, final judgments were entered on April 12, 1989. Thereafter, the trial court granted all defendants' cross-claims for contribution against the five settling defendants in the Dickerson case and entered the same order against the four defendants who settled with Zenobia. The compensatory judgments, therefore, were reduced by half by operation of the settlement releases and pursuant to the Uniform Contribution Among Tort–Feasors Act, Md.Ann.Code art. 50, § 16–20. Additionally, the trial court granted Anchor's cross-claim for indemnification against Raymark and dismissed Anchor from the case based upon Zenobia's release of Raymark.

The compensatory and punitive damages judgments have been appealed by Owens–Illinois, MCIC, Porter Hayden, Eagle–Picher and Anchor. Dickerson and Zenobia have appealed from the cross-claim judgments entered by the trial court.

At the time of the trial, Dickerson was 57 years old and was employed by the Baltimore County Board of Education as a school custodian. Zenobia was retired at age 65 after working 32 years for the Carling Brewery Company in Baltimore.

Dickerson alleged that he was exposed to asbestos while working as a laborer at the Bethlehem Steel Sparrows Point Shipyard in Baltimore from 1953–1955 and from 1958–1963. He also claimed that he was exposed to asbestos from 1955 to 1958 when he worked at the hot strip mill at Sparrows Point. He had no exposure after 1963.

Zenobia alleged that he was exposed to asbestos during his employment as a painter for four months in 1948 at the Bethlehem Steel Sparrows Point Shipyard; while working for 18 months at the Maryland Shipbuilding and Drydock Company shipyard between 1951 and 1952; and while employed as a clean-up man at the Carling Brewery Company for three months in 1968. He had no exposure after 1968. Both men alleged that they contracted asbestosis as a result of their exposure to asbestos fibers during the periods listed herein. Neither man claimed lost wages or prior medical expenses in connection with their physical condition. Additional facts will be discussed as they relate to each case.

The five appellants, MCIC, Owens–Illinois, Porter Hayden, Eagle–Picher, and Anchor Packing, raise the following issues:

1. Punitive damages were erroneously assessed against Owens–Illinois and Porter Hayden.
2. Deposition testimony was erroneously introduced against all five defendants under Md.Rule 2–419.

3. Porter Hayden's insulating and contracting activities were not a substantial factor in causing Zenobia's injuries.

4. The trial court erred in instructing the jury that Owens–Illinois had a continuing duty to warn after the time the company no longer manufactured, distributed, or sold asbestos-containing or other insulation products.

5. Owens–Illinois's contracting activities were not a substantial factor in Zenobia's injuries.

6. MCIC's contracting activities were not a substantial factor in any injury sustained by either Dickerson or Zenobia.

7. Anchor Packing was entitled to a judgment when Zenobia failed to prove that Anchor products contained asbestos or that he was regularly exposed to respirable asbestos dust from an Anchor product.

8. The trial court erred in refusing a new trial or remittitur on a $1,200,000.00 verdict when the plaintiff, Zenobia, gave a Swigert release to one defendant for $860.00 and offered to settle with all defendants for a total of $165,000.00.

9. The trial court erred by admitting state-of-the-art testimony as it existed after 1953, the last possible exposure of Zenobia to an Anchor product.

10. The trial court erred in instructing the jury that a manufacturer's conduct is not relevant in a "failure to warn" case based upon strict liability.

11. The trial court erred when it used the term "knew or *could* have known" rather than "knew or *should* have known" in describing a seller's duty to warn involving a dangerous product.

12. The trial court erred in instructing the jury that damages could be awarded not only if pleural plaques harmed the plaintiff, Dickerson, but if they were in themselves harmful.

The issues raised by the cross-appellants, Dickerson and Zenobia, are the following:

13. Whether it was reversible error for the trial court to order contribution by the settling defendants.

14. Whether Raymark, an absent debtor in bankruptcy, may be adjudicated a tortfeasor, indemnitor or contributor without leave of the bankruptcy court.

15. Whether the trial court erred in granting the cross-claim by Anchor for indemnity against Raymark and striking the verdict of the jury against Anchor.

Preliminarily, we note that after the appeals in this case had been filed Celotex and Eagle–Picher filed for protection under Chapter 11 of the United States Bankruptcy Code. We shall, therefore, stay the proceedings as to each of those defendants, but allow the proceedings to proceed as to the remaining defendants as well as the cross-claims raised, excepting those involving the two bankrupt defendants. Title 11 U.S.C. § 362(a) provides that the filing of a petition under Chapter 11 of the Bankruptcy Act operates as a stay of judicial proceedings pending against the debtor when the petition was filed. *See also Collier v. Eagle–Picher, et al.,* 86 Md.App. 38, 585 A.2d 256 (1991) (opinion by Wilner, C.J.).

## Issue No. 1
### Punitive Damages Against Owens–Illinois and Porter Hayden

Both Dickerson and Zenobia received punitive damage awards of $235,000.00 against Owens–Illinois and $2,500.00 against Porter Hayden.

In our review of the trial court's denial of the motions for judgment and judgment *n.o.v.,* we must resolve all conflicts in the evidence and make all reasonable inferences in favor of the party opposing the motion. *Wesko v. G.E.M., Inc.,* 272 Md. 192, 200, 321 A.2d 529 (1974).

This Court, in *Eagle–Picher v. Balbos,* 84 Md.App. 10, 578 A.2d 228 (1990) (Alpert, J.), set forth the necessary showing for recovery of punitive damages in Maryland's

asbestos personal injury cases. We indicated that we would require direct evidence that a particular defendant had substantial knowledge that the product(s) at issue was, or was likely to become, dangerous, and a gross indifference to the danger. *Id.* at 73, 578 A.2d 228. Elucidating, we said that we would require a showing that the defendant conducted itself "in an extraordinary manner characterized by a wanton and reckless disregard for the rights of others." *Id.*, citing *Exxon Corp. v. Yarema*, 69 Md.App. 124, 516 A.2d 990 (1986); R. Gilbert, P. Gilbert, and R. Gilbert, *Maryland Tort Law Handbook* § 25.3.1 (1986).

In *Balbos, supra,* this Court reversed the judgments for punitive damages because we did not find the extraordinary conduct which warrants an award of punitive damages in Maryland. We distinguished the *Balbos* case from cases where punitive damages were upheld. These latter cases involved instances where a manufacturer of asbestos-containing products withheld from its employees and from the public a significant amount of long-held information that asbestos exposure posed a risk to its asbestos workers; where a defendant had knowledge that its asbestos-containing product had already caused disease in other employees; where a manufacturer knew of the health risks associated with asbestos at the time it sold its product, that the product did not bond properly, and that it might emit asbestos fibers and it developed, marketed, and sold a comparable asbestos-free product in response to concerns and publicity about the health risks associated with asbestos; and, finally, where a manufacturer rejected the advice of experts to place a warning label on its product because of its concern with maintaining its profits.

In the present case, there was evidence that Owens–Illinois entered into an agreement with the Saranac Laboratory (Saranac) to conduct animal studies of its asbestos-containing Kaylo product. Saranac informed the medical director of Owens–Illinois that the animals used in the study developed asbestosis and emphysema, and that this finding would correlate with findings in human beings.

There was also evidence that Owens–Illinois's industrial hygienist was aware of the conclusion of the Saranac study, and that he was in close contact with Owens–Illinois's medical director on asbestos-related matters.

The evidence also showed that sometime in 1956 Saranac informed the medical director of Owens–Illinois that the Kaylo product contained a hazardous component and that the product should be labeled to reflect the hazard posed by the product. The indication to Owens–Illinois was that Kaylo would be hazardous to anyone who breathed the dust generated from the product, including those outside the manufacturing plants where the dust used in the studies was generated and obtained.

The evidence showed further that, although Owens–Illinois knew of the potential hazard posed by the manufacture and use of its product, it did not issue warnings or otherwise eliminate possible exposure to the asbestos component of its product.

The evidence from the perspective of Owens–Illinois revealed that it did not place a warning label on its product because no one at Saranac recommended that it do so and because it believed its employees were working in a safe environment. Owens–Illinois's industrial hygienist testified in a deposition admitted into evidence that the levels of exposure to the animals were extremely high and did not compare to the levels of exposure actually experienced at its manufacturing plants. He further testified that, based on dust studies, Owens–Illinois employees at the Kaylo plants were not exposed above the then-accepted level of exposure to asbestos, 5 million parts per cubic foot of air.

Finally, Owens–Illinois's industrial hygienist testified that Owens–Illinois did not warn others outside the plants (including bystanders, like plaintiffs in this case) of the dangers of exposure to Kaylo because it did not feel there was a danger to its own employees who were likely to be exposed to higher levels than end-users of the product.

Based on this evidence,[1] we conclude that Owens–Illinois was advised in 1956 that its asbestos-containing Kaylo product posed a hazard beyond its own employees and to those who used or might otherwise be exposed to the product and that, contrary to expert advice, it failed to place warnings on its product. We believe this conduct falls within the realm contemplated by this Court in *Balbos*. The trial court did not err in submitting the issue to the jury.

■ The evidence considered against Porter Hayden revealed that in 1956 an estimator of the company, who later became president, was aware that an insulator employed by Porter Hayden filed a worker's compensation claim for an alleged asbestos-related disease. The individual did not convey the information about the worker's compensation claim to any of his superiors outside the Newark, New Jersey, office of the company. He was unaware that any other asbestos-related worker's compensation claims had been filed against the company prior to 1960.

In addition, he indicated that he did not become aware of the hazards of asbestos until the mid to late 1960's. Another Porter Hayden employee, who worked for the company for 36 years and rose to the level of president, testified that Porter Hayden received annually from 50 to 100 workers' compensation claims. The 1956 workers' compensation claim was the only asbestos-related claim filed before 1970. This employee did not personally become aware of the hazards associated with asbestos until the late 1960's.

We are unable to conclude that Porter Hayden acted with the substantial knowledge and gross indifference we re-

---

1. The evidence presented against Owens–Illinois in this case goes beyond that considered by the Court in *Balbos* in reversing the judgment for punitive damages against Owens–Illinois. There was no evidence in *Balbos* that Saranac advised Owens–Illinois's medical director to label its product due to the hazardous component in Kaylo and that the asbestos dust generated from Kaylo posed a hazard to those outside the manufacturing plants. Owens–Illinois, moreover, was a manufacturer, not a supplier as was Porter Hayden, and had superior knowledge of the nature of the product and the potential for harm.

quire in upholding an award of punitive damages in the asbestos litigation context. Its knowledge of one asbestos-related workers' compensation claim in 1956 and a failure to warn as a result of that single incident is insufficient to generate a claim for punitive damages in light of our analysis in *Balbos*.

## Issue No. 2

## Deposition Testimony

Appellants Anchor, MCIC, and Porter Hayden contend that the deposition testimony of Dr. Thomas Mancuso was improperly admitted into evidence by the trial court. Owens–Illinois makes the same claim as to Dr. Mancuso and raises the same objection to the depositions of Mr. John Humphrey, Mr. Louis Pechstein and Dr. Kenneth W. Smith.

■ This case proceeded, as stated earlier, on strict liability, which focuses not on the defendants' conduct, but on the product. *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976). For recovery in an action based upon strict liability, the plaintiff must establish (1) that the product was in a defective condition at the time that it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was the cause of the injuries, and (4) that the product was expected to and did reach the consumer without substantial change in its condition. *Phipps, supra*, at 344, 363 A.2d 955, citing Restatement (Second) of Torts, § 402A (1965). The plaintiff in strict liability in tort cases need not prove any specific act of negligence.

Notwithstanding the elements to be proved in strict liability actions, the trial court herein, over the objection of the plaintiffs seeking to preclude the state-of-the-art defense, ruled that the plaintiffs were required to produce state-of-the-art evidence in their *prima facie* case.[2] As a result,

---

2. We assume the trial judge relied upon a prior ruling of the Circuit Court for Baltimore City (Levin, J.) in *Gist v. Raymark Industries, Inc.*,

negligence concepts were intermingled with strict liability considerations. The appellants herein, who supported the trial court's ruling below, now contest the evidence flowing from the trial court's ruling.

The trial court grouped Owens–Illinois and others as manufacturers, and Anchor, MCIC and Porter Hayden as suppliers. The deposition of Dr. Mancuso was admitted against all defendants and the depositions of Pechstein, Humphrey, Hazard, and Dr. Smith were admitted only against manufacturers.

We note that, in addition to the deposition testimony, Dr. Gerrit Schepers, currently Chief of Cardiovascular Diseases at the Veterans' Administration Hospital in Washington, D.C., testified to the state-of-the-art knowledge relating to asbestosis as it pertains to this case. He stated that as early as 1930 there were at least 50 medical articles published on asbestosis and that number increased to approximately 100 in 1940, to several hundred by 1950, and to 1,000 by 1960. He stated that he informed Owens–Illinois's medical director, Dr. Shook, and other officials of the company in 1955 of the hazards of Kaylo asbestosis and the necessity for warning labels on Kaylo because it contained hazardous components.

The deposition of Willis Hazard disclosed that he was a physicist and industrial hygienist who worked for Owens–Illinois from 1934 to 1974. He was aware of the health problems associated with asbestos in 1946 before his employer began commercial production of Kaylo in 1948. Hazard admitted receiving Dr. Scheper's report concerning the dangers posed by asbestos products in 1955,[3] and he stated that he discussed the various reports he received from the

---

wherein a plaintiff's motion to preclude a state-of-the-art defense was denied.

**3.** Dr. .Scheper exposed laboratory animals to Kaylo dust obtained from Owens–Illinois's plant. He concluded that the dust could not be expelled from the animals and that the resulting asbestosis would also occur in humans.

Saranac Laboratory study on Kaylo with Dr. Shook, medical director at Owens–Illinois.

The depositions of Dr. Smith, Mancuso, Pechstein, and Humphrey relate to what was knowable to those engaged in the asbestos industry prior to 1963. Their deposition testimony was considerably less probative than that of Dr. Scheper's live testimony. The court instructed the jury that a manufacturer's state-of-the-art knowledge includes what was knowable or scientifically discoverable in the scientific community, whereas a supplier is presumed to know that which is reasonably known and generally accepted by, and available to, others outside of the medical, scientific community. Thus, the jury was apprised of the various tiers of knowledge applicable to manufacturers and to suppliers, *i.e.*, actual knowledge; constructive knowledge, reflecting what should have been known; and state-of-the-art knowledge, which is what was discoverable, or could have been known.

■ Appellants contend that the depositions violate Md. Rule 2–419(c) and that they were not present at the depositions sought to be admitted and no predecessor in interest was present who had a similar motive to cross-examine the deposed witness. We reject these arguments for several reasons. Md. Rule 2–419 deals with the use of depositions where the witness is not available to appear in person. Defendants did not raise the issue of plaintiffs' failure to establish the unavailability of the witnesses at trial. The issue is waived and may not be raised for the first time on appeal. Md. Rule 8–131; *Bowen v. Md. National Bank*, 36 Md.App. 26, 373 A.2d 30 (1977). Hazard was properly found to be unavailable: he was a resident of Ohio; Mancuso was a resident of Pennsylvania.

■ Eagle–Picher was present at the Hazard deposition and at the Mancuso deposition and Owens–Illinois was represented when Mancuso was deposed. None of the remaining defendants were represented at the Mancuso questioning. We note that in *Clay v. Johns Manville*, 722

F.2d 1289 (6th Cir.1983), the depositions of Dr. Kenneth Smith were held to be admissible against Raybestos although that company was not present at the deposition.[4] The court reasoned that the defendants who were present had a similar motive to cross-examine Dr. Smith and the depositions, therefore, were admissible against Raybestos. A similar result was reached in *Dartez v. Fibreboard Corp., et al,* 765 F.2d 456 (1985). We think the presence of Eagle–Picher at both the Hazard and Mancuso hearings and the representation by Owens–Illinois at the Mancuso deposition forms an acceptable basis for admitting the depositions that have been questioned.

■ The trial court limited the application of the deposition testimony to the manufacturers and to their "knowability" of the hazards of asbestos. We perceive no error. This evidence, furthermore, was cumulative to that of Dr. Schepers and was, at most, harmless error.

### Issues No. 3, 5, 6, 7

### Substantial Factor in Injuries

Owens–Illinois, Porter Hayden, Anchor and MCIC allege that their activities were not a substantial factor in the injuries sustained by Zenobia. MCIC makes the same allegation as to Dickerson.

### No. 6, MCIC—Dickerson

■ At trial, Dickerson testified that he was employed at Bethlehem Steel Corporation's Sparrows Point Shipyard from 1953 to 1955 and again from 1958 to 1963. He performed primarily custodial duties aboard ships. He performed the same sort of work at Bethlehem Steel's hot strip mill from 1955 to 1958.

---

4. Dr. Kenneth Smith was a full-time physician employed by Johns Manville from 1944 to 1966. His testimony related to what his employer knew about asbestos-related health hazards in the 1950's.

As to the above employment at Sparrows Point, Dickerson stated that he worked with asbestos workers who were employed by outside contractors. He identified McCormick [MCIC] asbestos workers at the shipyard and hot strip mill by the presence of McCormick's trucks and the workers he recognized to be associated with McCormick. Dickerson believed the asbestos workers were using asbestos pipe covering and block because "asbestos" was indicated on the boxes he saw delivered to the ships and mill by the McCormick trucks.

Dickerson testified that while in the engine and fire rooms aboard the ships upon which he worked he was within about five feet of the pipe covers and that there was very little ventilation in the rooms. There were, however, blowers which stirred up the dust. He came in actual physical contact with asbestos-containing debris when he picked or swept it up and placed it in trash receptacles.

At the hot strip mill, Dickerson worked within eight to sixteen feet of the asbestos workers and, again, he came into physical contact with the debris as he cleaned it up and disposed of it.

### No. 6

### MCIC, Porter Hayden, Owens–Illinois and Anchor Zenobia

Zenobia testified at trial that he worked as a painter for Bethlehem Steel at the Sparrows Point Shipyard for four months between 1948 and 1949. He worked as a pipefitter at the Maryland Shipbuilding and Drydock Company from 1951 to 1953. He was exposed to asbestos for approximately three months sometime between 1968 and 1970 while employed at the National Brewing Company in Baltimore.

Like Dickerson, Zenobia testified that he worked exclusively aboard ship while employed at Sparrows Point. He saw asbestos workers working with asbestos-containing pipe covering and block material. He saw the names McCormick, Hayden, and Kaylo (the product manufactured

by Owens–Illinois) on the containers of pipe covering used by the insulators aboard ship. The containers for the block material were marked "Kaylo."

Zenobia testified that he worked as a pipefitter only aboard ships while at Maryland Shipbuilding. While in the engine and boiler rooms he worked around pipe covers using asbestos pipe covering and block material on a daily basis. The boxes containing the asbestos pipe covering were marked with the name "McCormick" and on the block material he saw the word "Kaylo."

Also like Dickerson, Zenobia indicated that the outside contractors employing the asbestos workers included the McCormick and Porter Hayden companies. He was able to identify them because of the presence of McCormick and Porter Hayden trucks near the gangways of the ships aboard which he worked. He was also able to identify them by the company names on the T-shirts worn by the employees. According to Zenobia, the trucks delivered the marked boxes to the ships, and the asbestos workers carried them aboard the ships.

According to Zenobia's testimony, he also handled asbestos gasket material supplied by Anchor while at Maryland Shipbuilding. He saw the letter "A" stamped on the rolls of the gasket material, used while he was fitting pipes, which emitted dust while he used the product.

While at the National Brewing Company, Zenobia worked around pipe covers while an addition was made to the facility. The pipe covers used McCormick and Kaylo materials. The asbestos workers were employed by Porter Hayden. He saw McCormick's products at the site.

As to proximity, Zenobia came into physical contact with the asbestos-containing products when he swept up debris and threw it away.

In *Eagle–Picher v. Balbos, supra,* we employed a two-step analysis in reviewing the trial court's denial of a motion for judgment and judgment *n.o.v.* We considered whether there was sufficient evidence that the defendant's

product was used at the site of the plaintiff's exposure, and whether the plaintiff worked within the vicinity of the asbestos workers using the product and, therefore, in the vicinity of the product itself. If both factors are established, one may reasonably conclude that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the condition that is the subject of the complaint. The testimony of the plaintiffs herein was more than sufficient to defeat the defendants' motions and the trial court did not err in denying the same.

### Issue No. 4

### Continuing Duty to Warn

■ Owens–Illinois and Anchor each contend that the court committed reversible error when it instructed the jury that the defendants had a continuing duty to warn Zenobia of asbestos hazards after the date of his last exposure. Owens–Illinois argues that it left the insulation industry in 1958 and could not owe any duty to warn thereafter. Anchor makes the same argument using a 1953 target date, which was the time of Zenobia's last exposure.

The instruction given by the court said:

The defendant's duty to warn is a continuing one. It does not end when or if the defendant stops manufacturing or selling asbestos. It does not stop when the plaintiff is no longer exposed to asbestos.

In *Balbos, supra,* we cited with approval *Lockwood v. AC & S, Inc.,* 109 Wash.2d 235, 744 P.2d 605 (1987), on the precise issue raised by the appellants herein. In *Lockwood* the plaintiff was exposed to asbestos while working in the shipyards in Washington state from 1942 until his disability retirement in 1972. In that year he ceased regular smoking, but occasionally smoked cigarettes thereafter. He was diagnosed as having asbestosis in 1979.

One of the defendants in *Lockwood,* Raymark, argued that it had no duty to warn Lockwood of the dangers of

asbestos after he was no longer exposed to the product. The Supreme Court of Washington disagreed, stating:

> We believe that where a person's susceptibility to the danger of a product continues after the person's direct exposure to the product has ceased, the manufacturer still has a duty after exposure to exercise reasonable care to warn the person of known dangers, if the warning could help to prevent or lessen the harm. Such a warning should be required to the extent practicable. Thus, it will depend on the circumstances if a warning to previous users of the product must be made by direct personal contact with such users. Alternative warning methods which may be reasonable in a given situation might include notices to physicians or advertisements.

We adopted the reasoning in *Lockwood* and applied it in *Balbos* and applied it to manufacturers and suppliers, including Owens–Illinois, one of the defendants therein.

The appellants suggest that the continuing duty to warn instruction has the effect of making them insurers of their products indefinitely. We disagree. A careful reading of *Lockwood* makes clear that *reasonable care* means to warn a previously exposed employee of known dangers. It does not require, as Owens–Illinois suggests, that they continue in "the great expense of indefinitely continuing research and development in an area in which Owens–Illinois has not been competitive in 31 years." Obviously, such a requirement would be unreasonable. What the duty to warn does mean is that if a manufacturer or installer becomes aware of additional dangers to those previously exposed to asbestos products, presumably through updated state-of-the-art data or other reliable scientific tests, the manufacturer or installer must make a reasonable effort to communicate that information to exposed employees whether active or retired.

The appellants can argue to the jury their departure from the insulating industry and a jury may decide that their failure to warn under the circumstances was reasonable. This does not mean, however, that they have no obligation

to warn if they become aware of potential harm to exposed workers. We conclude that the instruction given does not amount to reversible error in that neither Owens–Illinois nor Anchor ever gave any warning to anyone exposed, either currently or prospectively.

### Issue No. 8

### Anchor's Claim for New Trial or Remittitur

■ Anchor claims that the compensatory award of $1,200,000.00 to Zenobia was excessive. In support of that assertion, Anchor highlights Zenobia's release of Raymark Industries for $860.00 and a demand letter from Zenobia to all defendants one month before trial indicating his willingness to settle his case with the then remaining defendants for $165,000.00. Recognizing the infallibility of hindsight, we surmise that all of the defendants share Anchor's consternation.

The jury was instructed that the damages must reasonably compensate Zenobia and that it could not award speculative damages. It was permitted to consider his physical and emotional condition before and after his asbestos-related disease and whether his condition was permanent or progressive. There was medical evidence from which the jury could properly conclude that Zenobia's condition was permanent and progressive.

Settlement offers may be made for diverse and unrelated reasons. They are excluded because they discourage settlement. The trial court did not find the verdict to be excessive or one that shocked the court's conscience. In *Benequra v. Taylor*, 312 Md. 609, 541 A.2d 969 (1988), the Court of Appeals said:

> We know of no case where this Court has ever disturbed the exercise of the lower court's discretion in denying a motion for new trial because of the inadequacy or excessiveness of damages.

We decline to grant a new trial or to order a remittitur in the case *sub judice*.

### Issue No. 9

#### State-of-the-art Testimony After 1953, Zenobia's Last Exposure

We have addressed and decided that the appellants had a continuing duty to warn beyond the date of last exposure. That holding is dispositive of this issue raised by Anchor.

### Issues No. 10 and 11

#### Jury Instruction that a Manufacturer's Conduct is not Relevant in a "Failure to Warn" case Based upon Strict Liability [5]

■ Appellants' argument on this issue is twofold, *i.e.*, the court erred in instructing the jury that the manufacturer's conduct is not relevant in a strict liability-failure to warn case, and the court erred in using the term "could have known" rather than the lesser burden "should have known" of the dangers connected with the user of asbestos products.

Appellants cite the following portion of the court's instructions:

A strict liability case concerns the character of the product that is injected into the stream of commerce. It does not concern the defendant's conduct. Negligence is not part of a strict liability claim, nor is the conduct of manufacturers.

The court did, however, clarify what was required in establishing appellants' liability. It said:

A product of this type is only defective because it did not contain a warning of dangers of which the seller knew or could have known. When we talk about could have known as to a manufacturer, we are talking about that knowledge that is knowable or scientifically discoverable

---

5. This exception was filed by Eagle–Picher, no longer a party. By agreement, however, an objection or exception by any defendant is deemed to apply to all other defendants as their interests are affected by the ruling. We shall, therefore, address the issue.

in the medical/scientific community. The first element then, as to what must be proved by the manufacturing plaintiff [sic], is that the product was in a defective condition at the time that it left the possession or control of the manufacturer, remembering that it is defective because it did not contain warning of dangers that the seller—excuse me—manufacturer knew or that was knowable or scientifically discoverable in the medical/scientific community....

I give you a distinction, ladies and gentlemen. Remember that the manufacturer could have known what was knowable or scientifically discoverable in the medical/scientific community. As to the supplier, could have known is defined as reasonably known and generally accepted by and available to others, outside of the medical/scientific community.

At a later point in the instructions, according to appellants, the court again indicated that a manufacturer's conduct is not relevant when the court stated:

You ought to know that a manufacturer or seller is or may be, I will say, strictly liable even though he exercised all possible care in the preparation and sale of his product. The plaintiff need not prove negligence or fault in order for the defendants to be held strictly liable.

Immediately following the above comment, however, the court reiterated the standard applicable to this case, stating:

You remember that I told you that there is a different standard between the liability as to manufacturers and as to suppliers. Remember that I told you that standard concerned certain knowledge, that is what the manufacturer or supplier knew or could have known. Remember further that I told you that could have known is a different standard and distinguishable between the manufacturer or the supplier. A manufacturer could have known what is knowable or scientifically discoverable in the medical scientific community. The supplier could have known what is reasonably known and generally

accepted by and available to others outside of the medical scientific community....

A manufacturer or seller is held to the knowledge and skill of an expert and is conclusively presumed to possess all of the knowledge that is available to or possessed by an expert. Remember again, there is a different expertise to manufacturers and to suppliers. We know that manufacturers are held to what they know or what they could have known. We know, further, that could have known refers to what is knowable and to what is scientifically discoverable in the medical scientific community.

The entire ten week trial focused upon what was known, or what was within the state-of-the-art knowledge, *i.e.*, "knowable" by manufacturers and suppliers. Taken as a whole, the instructions fairly apprised the jury of the evidence required to sustain the claims advanced by Dickerson and Zenobia.

▍ Appellants' second attack on the knowability issue centers upon the trial court's use of the phrase "could have known" rather than "should have known." According to appellants, "could have" connotes "within the realm of possibility." Appellants visualize their burden under "could have" as suggesting that they hire every researcher in the country, around the clock, to study the effects of asbestos on bystanders from the first use of the product in the 1930's forward. They further suggest that they "could have" hired a genius who may have perceived the dangers before later scientific studies emerged. We point out, however, that the court's instruction limited "could have known" to what was discoverable in the medical/scientific community. The instruction given, reasonably interpreted, does not in any way support the absurd duty described by the appellants.

In addition, as we stated in *Rafferty v. Weimer*, 36 Md.App. 98, 110, 373 A.2d 64 (1977):

The Maryland law is well established that the trial court's instructions to the jury must be read as a whole and that it is not permissible to take isolated portions of

the charge which may contain inartificial methods of expression, when the charge, considered as a whole, fairly presents the case to the jury on the issues presented by the evidence in the case. [Citation omitted.]

The purpose of oral charges is to tell the jury in simple words what the law is in a case before them, and we will not be too particular in criticizing the words used if the result is sufficient. [Citation omitted.]

We have repeatedly stressed the fact that we cannot put the "trial judge in a strait jacket and prescribe or adopt a formula to be used and followed by him," with respect to his instructions to the jury. [Citation omitted.]

Issue No. 12

Pleural Plaques—Dickerson

Appellants allege error in the court's instructions on the presence of pleural plaques as shown on X-rays of Dickerson's lungs.[6] The court, appellants assert, stated that the mere presence of pleural plaques was sufficient to support a recovery by Dickerson. The part of the instruction complained of states:

[L]et me read to you another instruction so as to give clarity. I told you that the plaintiff can recover damages only *if he proves to you, by a preponderance of the* evidence, that he sustained physical harm because of asbestos exposure. I reminded you that you had heard testimony about pleural changes seen on the plaintiff's x-rays. You may not award damages for pleural changes

6. We noted in *Wright v. Eagle-Picher,* 80 Md.App. 606, 610 n. 2, 565 A.2d 377 (1989), that
pleural plaques are discrete lesions or places of thickening which occur in the pleurae. The pleurae are both the inner and outer lining of the lung. Pleural plaques are the most common manifestation of exposure to asbestos. Although pleural plaques do not automatically implicate asbestosis, those people with asbestosis usually do have pleural plaques.

unless you find that these changes were in themselves harm or that they actually harmed the plaintiff.

Earlier in its instructions the court advised the jury:

Now, the plaintiff can recover damages only if he proves to you by a preponderance of the evidence that he sustained physical harm because of his asbestos exposure. You heard testimony concerning pleural changes seen on the plaintiff's x-rays. You may not award damages for pleural changes unless you find that these changes have actually harmed the plaintiff.

This Court in *Wright v. Eagle–Picher*, 80 Md.App. 606, 565 A.2d 377 (1989), a case upon which appellants chiefly rely for disposition of this issue, addressed the propriety of a jury instruction regarding the relationship between general damages and pleural plaques. Appellants in *Wright* contended that the trial judge impermissibly invaded the province of the jury by instructing it that the exhibition of pleural plaques alone was not compensable.

Preliminarily, we observed in *Wright* that the question of whether the condition of pleural plaques constituted a compensable injury was a matter "on the cutting edge of medical knowledge" and an issue to be decided by a jury. *Id.* at 614, 565 A.2d 377.

The instruction at issue in *Wright* indicated that although the jury heard testimony that the plaintiffs may have had pleural plaques they could not award any damages based solely on the presence of the pleural plaques since *"there [was] no evidence that that condition by itself causes any injury, impairment or disability...."* *Id.* at 611, n. 3, 565 A.2d 377. In the absence of such evidence, we held that there was no error in giving the instruction to the jury, especially since counsel for appellant indicated with respect to pleural plaques that

"[t]he evidence is that they do not cause impairment. That they are an unnatural condition caused by the inhalation of asbestos fibers. They are a marker of asbestosis [sic] inhalation."

The instruction given in *Wright* and the comment made by plaintiffs' counsel do not reflect the state of the evidence in this case. For this reason, *Wright* is clearly distinguishable.

In the case at bar, there was, in fact, evidence regarding the harmfulness of pleural plaques in and of themselves. Dr. Orn Eliasson, Mr. Dickerson's physician, testified as follows regarding the presence of pleural plaques on Mr. Dickerson's x-rays:

[By Cross-appellant's attorney]:

Q. Now, Doctor, those plaques that you saw, they are— they're not disabling, are they?

A. Well, I think any plaque, presence of any pleural disease indicates there has been some injury to the lung.

Q. Doctor, [is] the plaque disabling?

A. It can be disabling.

Q. Is it disabling in Mr. Dickerson's case?

A. By association with the interstitia of the fibrosis, yes.

Q. Doctor, the plaque itself, does the plaque itself impair the functioning of the lung?

A. Yes.

It is well established Maryland law that a jury instruction is proper if, taken as a whole, it contains a fair statement of the law and the subject is fairly covered by the instruction. *See Casey v. Roman Catholic Archbishop,* 217 Md. 595, 143 A.2d 627 (1958); *West v. Belle Isle Cab Co.,* 203 Md. 244, 100 A.2d 17 (1953). We believe that the court's instruction as to damages and pleural plaques is a fair statement of the law applicable in this case.

The instruction stated clearly that damages could only be awarded if there was physical harm due to Dickerson's asbestos exposure. This comports with our holding in *Wright, supra,* at 615, 565 A.2d 377, that asbestos products liability suits in Maryland require evidence of physical injury. The instruction also made reference to the evidence regarding Mr. Dickerson's x-rays and the pleural plaques

reflected thereon and about which there was testimony as to their harmfulness. The instruction clearly indicated that in considering the medical evidence regarding the harm caused by pleural plaques, including that they could in themselves result in a physical impairment of Mr. Dickerson's lungs, the jury *could* award damages if they found that the pleural changes were themselves harmful. This part of the instruction also comports with the law as set forth in *Wright, supra,* at 614, 565 A.2d 377, where we intimated that a jury could and should (given that there is evidence at trial that pleural plaques are by themselves harmful) determine whether pleural plaques were themselves a compensable injury. Since the instruction was a fair statement of the law, we cannot conclude that there was error in its presentation to the jury.

## Issue No. 13

### Cross Appellants

■ Dickerson and Zenobia question whether the court erred in ruling that the settling defendants were liable for contribution, thereby reducing the judgments entered.

A separate, non-jury cross-claims trial was conducted in this case. The trial judge relied chiefly upon the trial record in granting all cross-claims. Cross-claims for contribution were granted against the GAF Corp. and Armstrong World Industries, Inc. GAF is the successor in interest of the Ruberoid Co.

Before trial, cross-appellants Dickerson and Zenobia settled their claims against GAF and Armstrong. The Release and Settlement of Claim (Release) executed by cross-appellants as to GAF and Armstrong indicated that, in the event the corporations were adjudicated joint tortfeasors, the amount of damages recoverable from the remaining would-be joint tortfeasors would be reduced by a *pro rata* share of the liability of GAF and Armstrong. GAF and Armstrong were adjudicated joint tortfeasors. The damages

due appellants from non-settling defendants were reduced by the trial court in contemplation of the executed releases.

On appeal, cross-appellants assert that the court erred in granting the cross-claims for contribution against GAF and Armstrong and in reducing their awards because there was insufficient evidence of exposure to their asbestos-containing products. We do not agree.

In *Pahanish v. Western Trails, Inc.*, 69 Md.App. 342, 354, 517 A.2d 1122 (1986), we stated that the province of this Court, in reviewing the decision of a trial court sitting without a jury, is to decide only whether there was evidence legally sufficient to support the finding of the trier of fact. Furthermore, where an action is tried without a jury, this Court will not set aside the judgment of the trial court on the evidence unless the judgment was clearly erroneous. Md.Rule 8–131(c); *Davis v. Davis*, 280 Md. 119, 372 A.2d 231 (1977). We are unable to conclude that the evidence adduced at the cross-claims trial of GAF and Armstrong was insufficient as a matter of law and that the trial court's judgment based on this evidence was clearly erroneous.

### A. GAF

The evidence considered by the court at the cross-claims trial of GAF consisted of: (1) Dickerson's and Zenobia's Answer to Interrogatory No. 79, (2) Dickerson's and Zenobia's opposition to GAF's Motion for Summary Judgment on Exposure; and (3) the Complaints filed on behalf of Dickerson and Zenobia.

In *Safeway Trails, Inc. v. Smith*, 222 Md. 206, 159 A.2d 823 (1960), the Court of Appeals indicated that interrogatories and answers offered and admitted into evidence under Md.Rules 413 and 417, as the answers of an adverse party, become "substantive evidence—sworn, although not conclusive, admissions of fact." *Id.* at 214, 159 A.2d 823. Maryland Rule 2–421, which was derived in part from former Rule 417, indicates broadly that answers to interrogatories may be used as permitted by the rules of evidence. Our rules of evidence are not codified. The rule regarding the

use of answers to interrogatories as admissions as set forth in *Safeway Trails, supra,* is, however, clear.

Cross-appellants argue, however, that their Answer to Interrogatory No. 79 is not an admission of exposure to GAF's products but rather an indication of what defendant manufacturer or supplier names they expected to hear at trial in the event that a party called any of the co-workers listed in the answer to testify. This argument is not persuasive. Interrogatory No. 79 is framed clearly to elicit information regarding plaintiffs' exposure to defendants' asbestos-containing products. Subparts of the interrogatory seek information as to job-specific duration of exposure; a description of the type of asbestos-containing product to which plaintiff was allegedly exposed; the identity of the supplier or distributor of each type of product to which plaintiff was allegedly exposed; and the manufacturer and trade or brand name of the product to which plaintiff was exposed.

Cross-appellants' Answer to Interrogatory No. 79 is likewise provided in the context of asbestos exposure. The answer is contained in what is termed "Exhibit R—Asbestos Exposure." Dickerson's answer lists Ruberoid (the predecessor in interest to GAF) as the manufacturer of the asbestos-containing Calsilite/7M pipe covering, block and cement products to which plaintiff was allegedly exposed while employed at the Sparrows Point Shipyard for nine years. Zenobia's answer lists Ruberoid as the manufacturer of the Calsilite/7M products to which he was allegedly exposed for three years while working at the Maryland Shipbuilding and Drydock Company.

Since cross-appellants seem to acknowledge in their Answer to Interrogatory No. 79 that they were exposed to the products listed therein, we hold that the answers are admissions of exposure properly considered by the trial court in finding GAF liable for contribution as a joint tortfeasor in this case.

■ The trial judge also considered Plaintiffs' Opposition to Motion for Summary Judgment on Exposure in granting the cross-claims against GAF. In *Secor v. Brown,* 221 Md. 119, 156 A.2d 225 (1959), the Court of Appeals indicated that under Maryland law there is a *prima facie* presumption that an attorney has the authority to bind his client by his actions relating to the conduct of litigation. *Id.* at 123, 156 A.2d 225. The Court noted that this was particularly the case where admissions were made in the course of trial. We believe the rule is properly extended to admissions made on behalf of a client in documents drafted and filed in the ordinary course of litigation. In *Aetna Casualty Co. v. Kuhl,* 296 Md. 446, 463 A.2d 822 (1983), we defined broadly an admission to include "the words or acts of a party opponent ... offered as evidence against him. Admissions are considered to be substantive evidence of the facts admitted." *Id.* at 455, 463 A.2d 822.

■ In their Opposition to Motion for Summary Judgment on Exposure, Dickerson and Zenobia indicate that circumstantial evidence "serves to clearly demonstrate the involvement of GAF in the case." In support of this contention, the motions admit that Dickerson and Zenobia were "very clear" in indicating that they worked around Armstrong insulators and that Ruberoid "Calcilite" was the product of choice among these insulators. The Opposition also asserted that "there is abundant testimony that the asbestos products being installed around these plaintiffs by a contractor that they recognized and on days they recalled working on were those of the Ruberoid Company, and, ultimately, the responsibility of GAF."

Because we regard the statements made in the Opposition as admissions of exposure to the GAF products used and installed by Armstrong asbestos workers and made on behalf of cross-appellants in the course of this litigation, the trial court properly considered this evidence in granting the cross-claims against GAF.

Finally, the court considered the complaints filed by Dickerson and Zenobia in determining whether contribution against GAF was appropriate. Both plaintiffs filed amended complaints. Dickerson's amended complaint adopted by reference the "Shipyard Master Complaint" and "Plant Cases Master Complaint." Zenobia's amended complaint adopted the "Shipyard Master Complaint" and the "Other Cases Master Complaint." In their amended complaints, Dickerson and Zenobia stated that the defendants named in the complaints produced the asbestos fibers and dust inhaled by plaintiffs.

Under Maryland law, party admissions in pleadings are considered to be substantive evidence of the facts admitted. *Castiglione v. Johns Hopkins Hosp.*, 69 Md.App. 325, 336, 517 A.2d 786 (1986), *cert. denied*, 309 Md. 325, 523 A.2d 1013 (1987). Accordingly, the statement made in the adopted complaints constitutes an admission of exposure to GAF's products which the trial court properly considered at the cross-claim trial.

As a threshold matter, we hold that the evidence offered and admitted into evidence against GAF at the cross-claims trial was admissible as admissions of exposure to GAF's products. In addition, we believe this evidence was legally sufficient to support the trial court's determination that GAF was a joint tortfeasor liable for contribution in this case.

### B. Armstrong

In granting the cross-claims against Armstrong in the Zenobia case, the trial court considered Zenobia's Answer to Interrogatory No. 79 and Complaint. As we found in the case of GAF, this evidence was properly considered by the trial court at the cross-claims trial.

The court properly considered Zenobia's Answer to Interrogatory No. 79, which indicated that Zenobia was exposed to asbestos-containing pipe covering, block, and cement material supplied by Armstrong and affixed with the Armstrong label while he worked at the Sparrows Point Ship-

yard for approximately one year. The answer also indicated that during this time Armstrong supplied the Calsilite/7M asbestos-containing pipe covering, block and cement products manufactured by Ruberoid and used by Zenobia. The answer further indicates that Zenobia was exposed to the asbestos-containing products supplied by Armstrong and with the Armstrong label while employed at the Maryland Shipbuilding and Drydock Company for approximately three years.

The Zenobia Complaint was, for the reasons stated with respect to the GAF cross-claims, properly considered by the trial court as admissions of exposure of Zenobia to the products supplied by Armstrong.

In addition to the documentary evidence admitted against Armstrong, the trial court considered the trial testimony of Mr. Zenobia. This testimony, which contains admissions properly admissible against Zenobia under our application of *Aetna Casualty & Sur. Co., supra,* supports his Answer to Interrogatory No. 79. At trial, Zenobia testified that while working at the Maryland Shipbuilding and Drydock Company for approximately three years he saw boxes of Armstrong products at the work site. He also testified that while working at the National Brewery Company between 1968 and 1970, he worked around pipe covers using asbestos-containing products supplied by Armstrong. This testimonial evidence of exposure was properly considered in conjunction with Zenobia's Answer to Interrogatory No. 79 and Complaint and were, together, legally sufficient evidence to support the trial court's determination that Armstrong was a joint tortfeasor liable for contribution under Maryland law.

## Issue No. 14

 Cross-appellants question whether Raymark, an absent debtor in bankruptcy, may be adjudicated a tortfeasor, indemnitor, or contributor without leave of the bankruptcy court.

Despite the fact that an involuntary petition in bankruptcy had been filed against Raymark Industries, Inc. (Raymark) at the time of the cross-claims trial, the trial court adjudicated Raymark a joint tortfeasor and granted all cross-claims against it. The court's cross-claim order stated simply that all cross-claims for contribution against Raymark were granted. The docket entry reflects similarly that cross-claims against Raymark were granted. The record reflects that by agreement of counsel and the court no "judgment" in the usual sense was to be entered against Raymark in the cross-claims trial. Prior to the cross-claims trial, cross-appellants Dickerson and Zenobia executed a "Release and Settlement of Claims" as to Raymark. Under the terms of this document, the Release was to be construed pursuant to the Uniform Contribution Among Tortfeasors Act. Under this Act, the release of a joint tortfeasor reduces a plaintiff's claims against other tortfeasors by the amount of consideration paid for release or an amount or proportion provided for in the release, whichever is greater. Md.Ann.Code art. 50, § 19 (1986). The Release executed in this case provides for a *pro rata* reduction of damages in the event that Raymark should be adjudicated a joint tortfeasor.

On appeal, cross-appellants attempt to avoid the implementation and ramifications of the Release they executed with Raymark. They now assert that Raymark could not properly be adjudicated a joint tortfeasor while it was under the protection of the Bankruptcy Court pursuant to 11 U.S.C. § 362(a)(1). We do not agree. We do not believe that the automatic stay provisions of § 362(a)(1) apply in this case to preclude the judgment of the trial court that Raymark was a joint tortfeasor and that cross-appellants' damages should be reduced by Raymark's *pro rata* share.

11 U.S.C. § 362(a)(1) provides:

Automatic Stay.

(a) ... a petition filed under this title operates as a stay, applicable to all entities—of

(1) the commencement or continuation ... of a judicial ... proceeding against the debtor that was or could

have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title. . . .

From the face of the statute, and a reading of its legislative history, it is apparent to us that the automatic stay provision contained in the Bankruptcy Code operates to benefit only the debtor estate. It does not protect a party seeking to avoid a judicial order which reduces the amount of damages it might recover by a *pro rata* share of the defendant bankrupt.

The legislative history of 11 U.S.C. § 362(a)(1) indicates that

[t]he automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions.

H.R.Rep. No. 95–595, 95th Cong. 2d Sess. 340 (1978) U.S. Code Cong. & Admin.News 1978, pp. 5787, 6296. Applicable bankruptcy case law agrees that standing to invoke the protection of the automatic stay resides in the debtor estate and not a creditor. *See In re Globe Inv. and Loan Co.*, 867 F.2d 556, 559 (9th Cir.1989); *In re Brooks*, 79 B.R. 479, 481 (B.R. 9th BAP Cir.1987), *aff'd*, 871 F.2d 89 (9th Cir.1989); *In re Stivers*, 31 B.R. 735 (Bankr.N.D.Cal.1983); *In re Fuel Oil Supply & Terminating, Inc.*, 30 B.R. 360, 362 (Bankr. N.D.Tex.1983).

Aside from the fact that we do not believe Dickerson and Zenobia have standing to invoke the protection of the automatic stay under current bankruptcy law, we find that under the circumstances of this case Raymark, who might otherwise have standing, is not a protected "debtor" as contemplated by § 362(a)(1).

At the cross-claims trial, counsel for Dickerson and Zenobia stated clearly that they were not seeking a judgment against Raymark so as not to "run afoul of the federal [bankruptcy] law." Instead, they were seeking only a factual determination of whether Raymark was a joint

tortfeasor. There was agreement that the court should simply recommend an order of satisfaction or reduction. The trial court ruled accordingly that cross-appellants' recovery would be reduced by Raymark's *pro rata* share. Therefore, Raymark was not "indebted" to cross-appellants as a result of the trial court's decision.

As we have indicated, the automatic stay provision of § 362(a)(1) of the Bankruptcy Code is intended to protect the assets of the bankrupt from its creditors. In this case, Raymark owes its money judgment by virtue of the release executed by cross-appellants. Therefore, the automatic stay provision does not apply. As a result, the trial court was free to adjudicate Raymark a joint tortfeasor liable for contribution if it considered the evidence of proximate cause sufficient to warrant its finding.

The evidence considered by the trial court at the cross-claims trial of Raymark included Dickerson's and Zenobia's original complaints and the deposition of Theodore Grant, an employee of Anchor, who testified in another action as to the business connections between Anchor and Raymark.

As we held with respect to the cross-claims against GAF and Armstrong, cross-appellants' complaints considered against Raymark were admissions of exposure to Raymark's products since admissions in pleadings are considered to be substantive evidence of the facts admitted. *Castiglione v. Johns Hopkins Hosp.*, 69 Md.App. 325, 336, 517 A.2d 786 (1986), *cert. denied*, 309 Md. 325, 523 A.2d 1013 (1987). The Dickerson and Zenobia complaints stated that the named defendants provided the asbestos fibers and dust inhaled by plaintiffs. As we have indicated, we believe this evidence of exposure was properly considered as an admission by the trial judge in determining that Raymark was a joint tortfeasor liable for contribution.

The court also properly considered the deposition testimony of Theodore Grant. Grant testified in another asbestos-related case that he was a current employee of Anchor and that from the 1940's to 1970's Raymark was the prime supplier of Anchor's asbestos-containing sheet gasket mate-

rial. Grant stated, in addition, that 75 to 85 percent of the gasket material purchased by Anchor was purchased from Raybestos–Manhattan, the predecessor in interest of Raymark.

Cross-appellants contend that the court erred in admitting the Grant deposition in violation of Md.Rule 2–419(c). Based on our earlier holding herein, that Md.Rule 2–419(c) does not require a strict identity of parties and issues requirement, we cannot agree.

Although Mr. Zenobia was not represented at the Grant deposition, counsel for Raymark was present as a party and had the same motive to cross-examine Grant as to the relationship between Anchor and Raymark and any sales arrangements that existed involving asbestos-containing sheet gasket material as Mr. Zenobia himself would have had. Therefore, we believe that this deposition testimony was properly considered by the trial judge in conjunction with plaintiffs' complaints. Together, they constituted legally sufficient evidence to support the trial court's judgment that Raymark was a joint tortfeasor liable for contribution.

## Issue No. 15

Cross-appellants question whether the trial court erred in granting the cross-claim by Anchor for indemnity against Raymark and in striking the jury verdict against Anchor.

The trial court, in the secondary phase of this case, heard the cross-claims for contribution among the defendants against whom judgments were rendered in the primary case and the settling defendants. Included in the cross-claim litigation was a claim by Anchor, a supplier, against Raymark, a manufacturer, for indemnification in the Zenobia case.

One of Zenobia's principal arguments against consideration of the issue of indemnification was the status of Raymark as a bankrupt company. Zenobia argued that without leave of the bankruptcy court, the proceeding by Anchor was precluded by federal law. We have already decided that issue adversely to Zenobia for the reason that

Anchor was not seeking a monetary judgment against Raymark, but an adjudication that Anchor was entitled to indemnification by Raymark which, concededly, would not be available unless and until Raymark emerged from bankruptcy. That legal adjudication served only to satisfy Zenobia's judgment against Anchor because of Zenobia's release of Raymark.

The release of Raymark by Zenobia provides for a *pro rata* share reduction of liability if Raymark is found to be a joint tortfeasor and provides that:

It is further understood and agreed that the plaintiffs will hold harmless the party released herein from any and all liability arising from subrogation claims under any medical or compensation payments due or claimed to be due under the law, state or federal, regulation or contract *and from any and all other liability arising out of the claims by the plaintiffs* with the exception of the consideration recited herein. It is the intention of the parties to limit the releasee's liability to the consideration recited herein. (Emphasis supplied.)

The trial court, in deciding the right to indemnification issue, had before it the deposition testimony of Theodore Grant who has been continuously employed by Anchor since 1944. Grant stated that from the 1940's through the 1970's Anchor bought between 75 and 85 percent of its gasket material from Raymark and that warnings did not appear on products shipped by Raymark until five or six years prior to his deposition which was in March, 1986. The court granted summary judgment for Anchor on Zenobia's claim for punitive damages which established that Anchor did not have actual knowledge of the defect in the product. From the facts set forth above, the trial court apparently concluded that it was more likely than not that any Anchor gasket material Zenobia used while employed at Maryland Shipbuilding in 1951 was supplied by Raymark.

Elsewhere in his deposition, Grant testified that in the Manheim, Pennsylvania, Anchor facility, one of three An-

chor locations, the company had offices handling the billing for all of Anchor's branches. No products were sold through the offices, but a small shipping facility was maintained at the same location and Raymark's predecessor, Raybestos, had a manufacturing plant in the same building. Thus, some orders received by Anchor from customers were filled by direct shipment from Anchor's shipping department upon receipt of the manufactured pump packing, brake lining and gaskets from Raybestos in the same building. All of the named products contained asbestos. In other Anchor warehouse facilities, the product would be shipped from the manufacturer to an Anchor warehouse and then to the customer.

On a later visit to the Raybestos plant in the 1970's, Grant recalled that some of the employees were wearing masks. At that time Grant became aware that "there was at least a possibility of harm from asbestos or dust that may have been created in manufacturing asbestos products." As to labels placed on the products sold by Anchor, Grant testified that the trade name or logo was placed on the packaging by the manufacturer in accordance with Anchor specifications. Warning labels, according to Grant, were first placed on the products by the manufacturer and in the early 1980's Anchor began placing warning labels on products containing asbestos.

The trial court, in deciding that Anchor was entitled to indemnification by Raymark, cited *Hanscome v. Perry*, 75 Md.App. 605, 542 A.2d 421 (1988), as authority for the court's holding. In *Hanscome* (Wilner, C.J.), we acknowledged that a right of indemnification can arise by express agreement or by implication. In the present case we are concerned with an implied right of indemnification, because no express right is alleged. We pointed out in *Hanscome* that the circumstances from which an implied right of indemnification has been recognized are rather limited, citing *Araujo v. Woods Hole, Martha's Vineyard*, 693 F.2d 1 (1st Cir.1982), which states:

[A] contractual right to indemnification will only be implied when there are unique special factors demonstrating that the parties intended that the would-be indemnitor bears the ultimate responsibility ... or when there is a generally recognized special relationship between the parties. [Citations omitted.]

The tort-based right of indemnification is set forth in the Restatement of Restitution, § 96, which provides:

A person who, without personal fault, has become subject to tort liability for the unauthorized and wrongful conduct of another, is entitled to indemnity from the other for expenditures properly made in the discharge of such liability.

Most courts have liberally construed the "without personal fault" condition set forth in the Restatement and have recognized an implied right of indemnification by permitting one passively culpable to seek indemnification from the party primarily responsible for the wrong. Thus, the mere fact that two or more parties may be adjudged joint tortfeasors does not necessarily establish that one may not be entitled to indemnification by another. *See Peoples' Dem. Republic of Yemen v. Goodpasture, Inc.*, 782 F.2d 346 (2d Cir.1986), and *Baltimore & Ohio R. Co. v. Howard Co.*, 113 Md. 404, 77 A. 930 (1910), allowing a passively negligent tortfeasor to recover from "the sole actual wrongdoer and creator of the dangerous condition."

In failure to warn cases, the cause of action, as here, is essentially one in strict liability into which negligence creeps to the limited extent of analyzing the reasonableness of the defendant's conduct on the assumption that it knew of the defect. *See Promaulayko v. Johns Manville Sales Corp.*, 116 N.J. 505, 562 A.2d 202 (1989). The manufacturer, Raymark, placed the product into the stream of commerce. The distributor and retailer, Anchor, is a conduit in the sale to the ultimate purchaser, Maryland Shipbuilding, and to the user, Zenobia. Anchor sold the product without alteration in the form in which it was received from Raymark. There was evidence that from the 1940's until the

1970's Raymark was Anchor's primary supplier of sheet gasket material and that 75 to 85 percent of that product supplied by Anchor to Maryland Shipbuilding was obtained from Raybestos, Raymark's predecessor.

The verdict rendered against Anchor establishes that Anchor has been held strictly liable in tort as part of the chain of those who introduced the asbestos product into the commercial world. There is no evidence that Anchor had actual knowledge of the dangers posed by the gasket material purchased from Raymark at or about the time of Zenobia's exposure in 1951. We hold, therefore, that the trial court was not clearly erroneous in deciding that Anchor was entitled to indemnification by Raymark.

We recognized the right of a distributor to obtain indemnification against a manufacturer in *Loh v. Safeway Stores, Inc.*, 47 Md.App. 110, 422 A.2d 16 (1980). In that case, the plaintiff was injured when eating a product purchased from Safeway and manufactured by Garden State. Garden State sent the plaintiff a check for $1,000.00 as the value of her claim. After cashing the check, appellant sued Safeway who, in turn, filed a third-party claim for indemnification against Garden State. On remand for a trial on the merits, the trial court granted Safeway's indemnity claim against Garden State because of the manufacturer's primary responsibility. Under these circumstances, the plaintiff's release of Garden State also released Safeway. The same rationale applies herein. Zenobia released Raymark. Anchor has been held to be entitled to indemnity by Raymark. Zenobia is entitled to nothing from Anchor.

JUDGMENT AWARDING PUNITIVE DAMAGES AGAINST PORTER–HAYDEN REVERSED. REMAINING JUDGMENTS ENTERED BY THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.