993 A.2d 1113

**Darryl K. HARROD**

**v.**

**STATE of Maryland.**

**No. 1177 Sept.Term, 2008.**

Court of Special Appeals of Maryland.

April 30, 2010.

88

90

Eric A. Harrington (Williams & Connolly LLP, on the brief), Washington, DC, for Appellant.

Gary E. O'Connor (Douglas F. Gansler, Atty. Gen., on brief), Baltimore, MD, for Appellee.

Panel: DEBORAH S. EYLER, MATRICCIANI, and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

On the evening of January 27, 2007, two Montgomery County police officers, working off-duty as private security for the Majestic Movie Theater in Silver Spring, but dressed in their standard police uniforms, were approached by a male patron who told them that a man in the concession line who appeared to be intoxicated had threatened him with a knife.

He pointed out a man, later identified as Darryl K. Harrod, the appellant, as the person who had threatened him. The officers responded by escorting the appellant from the line and placing him against a nearby pillar, where they frisked him for weapons. When one of the officers reached into the appellant's pocket to retrieve what he believed was a folding knife, he discovered a large plastic baggie containing crack-cocaine. The item the officer thought was a knife in fact was a cigarette lighter.

The appellant was first tried in the Circuit Court for Montgomery County on August 28 and 29, 2007, on charges of second-degree assault and possession with intent to distribute a controlled dangerous substance. He was acquitted of the assault charge, but the jury was unable to reach a verdict on the possession with intent to distribute charge, resulting in a mistrial as to that count. In a retrial on March 4 and 5, 2008, the appellant was convicted of the possession with intent to distribute charge.

The appellant presents the following questions on appeal, which we have reordered as:

I. Did the trial court err in failing to grant [his] suppression motion because the search violated the Fourth Amendment?

II. Did the trial court err in admitting the prior testimony of Officer [Pete] Duggan and the chemist Susan Cohen from the first trial?

III. Did the trial court err in admitting the chemist report [on the narcotics recovered from his person]?

For the reasons stated below, we shall affirm the judgment. For ease of discussion, we shall summarize the pertinent facts and proceedings issue by issue.

## DISCUSSION

### I.

### The Suppression Hearing

Prior to trial, the appellant moved to suppress the narcotics discovered in his possession as the product of an illegal search

and seizure. The suppression hearing took place on August 27, 2007, the day before the start of the first trial. The two Montgomery County police officers who performed the search, Sergeant Detective Paul Liquorie and Patrol Officer Omar Tortolero, testified on behalf of the State. Joan Burriss, a friend of the appellant who had accompanied him to the theater on the evening in question, appeared on behalf of the defense.

The officers testified that they were standing in the general patron area of the theater, when they were approached by a "Mr. Felice Arias," [1] who claimed he had bumped into someone in the concession line, and that the person had "pulled out a knife" and "tr[ied] to pick ... a fight." According to the officers, Arias told them the person smelled of alcohol and that he had threatened to "put [Arias] to sleep." The officers did not witness anything that corroborated Arias's story, but Sergeant Liquorie found it "very unusual for someone just to come up out of the blue and tell you that someone ... got into a fight with them." Arias did not specify when the incident had occurred, but Sergeant Liquorie's impression was that it "had just happened." Sergeant Liquorie requested that Arias identify the person who had threatened him, and Arias pointed to the appellant. Arias then left the scene. He did not describe the knife, and none of his statements were recorded by the officers.[2]

The officers approached the appellant and asked him to walk to a large pillar approximately ten steps from the concession line. Sergeant Liquorie directed the appellant to the pillar by placing his hand on the appellant's arm. Both officers noticed that the appellant's eyes were bloodshot, and that his breath and body smelled of alcohol. The appellant was ordered by Sergeant Liquorie to place his hands on the

---

**1.** The indictment lists the victim of the alleged second-degree assault as "Carlos Feliz–Arias." The docket sheet also reflects that a personal service return was mailed to a "Carlos Feliz–Arias."

**2.** The officers were not required to take a written statement as part of their private security duties.

pillar and stand in a frisk position.[3] Sergeant Liquorie then patted down the appellant while Officer Tortolero stood in a back-up role, watching the appellant's hands to ensure he did not reach for a weapon.

When Sergeant Liquorie reached the appellant's left front pants pocket, he "felt an object at the bottom of the pocket that [he] believed could possibly be a folded knife." When he put his hand in the pocket to retrieve the object he thought was a knife, he discovered on top of the suspected knife "a large baggie holding several other smaller red baggies which [he] immediately identified as crack cocaine." The sergeant also discovered that the suspected knife was actually a "Bic like style cigarette lighter." He explained that he mistook the lighter as a folding-style pocket knife because the appellant was wearing heavy sweat pants that made it "hard to manipulate anything through the exterior."

After the lighter and baggie of narcotics were seized, the officers handcuffed the appellant and escorted him outside the movie theater. There, Officer Pete Duggan, an on-duty Montgomery County Police Officer, took the appellant and the items of evidence into custody. As noted, Joan Burriss testified for the defense. She stated that, before the encounter with the police officers, she was standing next to the appellant in the concession line and that a "fair-skinned" African–American male who was also standing in line was blocking them from moving forward. Both Burriss and the appellant said "excuse me" to prompt the individual to move. The individual "just stood there." Eventually, the man told them to "go ahead" and walked out of the line. At that point, she and the appellant were approached by the officers.

The officers did not speak with Burriss before or after escorting the appellant to the pillar. According to Burriss, the officers took a lighter, a pack of cigarettes, and a cell phone from the appellant's pockets. She claimed she had not

---

3. On cross-examination, Sergeant Liquorie agreed that he had "commanded" the appellant to stand in a frisk position and this was "not a consensual encounter."

seen the appellant drink any alcohol that evening, nor could she smell alcohol on his breath or person.

At the conclusion of the hearing, the motion court denied the appellant's motion. The court found that the officers had conducted a *Terry*[4] stop and frisk for a weapon and "nothing more." Although the court was "disturb[ed]" by the level of force used by the officers to remove the appellant from the line and place him against the pillar, it found that the officers had stayed within "the scope and purpose of a *Terry* stop" in their conduct, and that the narcotics were discovered by mere inadvertence when Sergeant Liquorie retrieved what he thought was a weapon from the appellant's pants pocket. The circumstances recounted by the court as justifying the *Terry* stop and frisk included the large crowd in the lobby area where the incident occurred (Sergeant Liquorie testified that the theater could "have easily a couple hundred people in [the lobby] area getting concessions and waiting"); the "highly unusual" report and identification of the appellant by Arias; the fact that the appellant smelled of alcohol, which corroborated Arias's report that the aggressor was intoxicated; and that the Bic-style lighter could have been a folded knife that, when opened, would "become[ ] a weapon" that could be used "to threaten somebody."

### Standard of Review

When reviewing a decision on a motion to suppress evidence, we must view the evidence presented at the suppression hearing in a light most favorable to the party prevailing on the motion. *Crosby v. State*, 408 Md. 490, 504, 970 A.2d 894 (2009). We defer to the motion court's factual findings, rejecting them only if clearly erroneous. *Id.* at 504–05, 970 A.2d 894. We make an independent legal determination, however, as to whether the challenged search violated the Fourth Amendment. *Id.* at 505, 970 A.2d 894. Our review is limited to the record produced at the suppression hearing. *Id.*

---

4. Referring to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

### The Propriety of the Search Under the Fourth Amendment

The appellant advances three alternative arguments as to why the search violated his Fourth Amendment rights and the narcotics evidence therefore should have been suppressed. First, the actions of the officers in escorting him to the pillar and frisking him amounted to an arrest unsupported by probable cause. Second, even if the encounter was not an arrest but merely was a *Terry* stop, neither the *Terry* stop nor the frisk was supported by a reasonable articulable suspicion that criminal activity was afoot or that the appellant was armed. Finally, even if the *Terry* frisk was supported by a reasonable articulable suspicion of weapons possession, it exceeded the scope allowed by the Fourth Amendment.

The State responds that the appellant failed to preserve the argument that he was unlawfully arrested; that, even if preserved, the officers' actions did not constitute an arrest, but rather a permissible *Terry* stop and frisk for weapons supported by the tip from a "citizen-informant"; and that the search was within the scope of a *Terry* frisk because "the officer felt a hard object that he [reasonably] thought might be a knife," and discovered the narcotics while acting "properly [to] remove[ ] it."

■ The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." When a search violates the Fourth Amendment, "the usual remedy is to suppress any of the resulting ... evidence." *Myers v. State*, 395 Md. 261, 282, 909 A.2d 1048 (2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 485–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

The Court of Appeals has described the two "tiers" of interaction between police and citizens that are regulated by the Fourth Amendment as follows:

"The most intrusive encounter, an arrest, requires probable cause to believe that a person has committed or is committing a crime. The second category, the investigatory stop or detention, known commonly as a *Terry* stop, is less intrusive than a formal custodial arrest and must be supported by reasonable suspicion that a person has committed or is about to commit a crime and permits an officer to stop and briefly detain an individual. . . . "

*Bailey v. State*, 412 Md. 349, 363, 987 A.2d 72 (2010) (quoting *Swift v. State*, 393 Md. 139, 150, 899 A.2d 867 (2006)) (alterations in original). The Court further has explained that consensual encounters do not trigger the Fourth Amendment at all:

"The least intrusive police-citizen contact, a consensual encounter, . . . involves no restraint of liberty and elicits an individual's voluntary cooperation with non-coercive police contact. A consensual encounter need not be supported by any suspicion and because an individual is free to leave at any time during such an encounter, the Fourth Amendment is not implicated; thus, an individual is not considered to have been 'seized' within the meaning of the Fourth Amendment."

*Bailey* at 363–64, 987 A.2d 72 (quoting *Swift*, 393 Md. at 151, 899 A.2d 867) (alterations in original).

██ Although the police officers in this case were working as private security guards during the search in question, they were nonetheless acting under color of state authority, and therefore were subject to the Fourth Amendment. As we explained in *In re Albert S.*, 106 Md.App. 376, 394–95, 664 A.2d 476 (1995), which likewise involved a challenge to a search performed by an off-duty Montgomery County police officer working as a private security guard:

A police officer on active duty has legal authority to take certain actions toward and make certain demands of private citizens. Each citizen, in turn, is protected when accosted by a police officer by certain constitutional rights. Thus, we believe it imperative that a private security guard, who by

the use of his or her police vehicle [5] and by the duties he or she undertakes to perform, has shifted his or her role and thereby acts as an agent for the State, must be mindful of his or her obligation to confer on those who come within the ambit of his or her law enforcement responsibilities all of the rights to which a citizen dealing with a police officer on active duty would be entitled. Stated otherwise, such an officer must be mindful that, when he or she acts under color of law while off-duty, he or she is subject to the Fourth Amendment and cannot circumvent the constitutional limitations on his or her conduct.

■■■ Thus, whether the appearance of police authority is created by the use of a marked patrol car, or, as in this case, the donning of an official police uniform, such a display will subject the officer's conduct to Fourth Amendment scrutiny. *See id.* at 391, 664 A.2d 476 (citing cases in which off-duty police officers wearing uniforms or displaying badges were deemed state actors).

■■■ In the case at bar, there is no dispute that the encounter in question was nonconsensual, and therefore was subject to the Fourth Amendment. Thus, the officers' actions constituted either an arrest or an investigatory detention/*Terry* stop. However classified, because the search and seizure were not carried out pursuant to a warrant, the State bore the burden of proving Fourth Amendment satisfaction. *Bailey, supra,* 412 Md. at 366, 987 A.2d 72 (citing *Paulino v. State,* 399 Md. 341, 348, 924 A.2d 308 (2007)).

■■■ An arrest is composed of four elements: " '(1) an intent to arrest; (2) under a real or pretended authority; (3) accompanied by a seizure or detention of the person; and (4) which is understood by the person arrested.' " *Id.* at 370, 987 A.2d 72 (quoting *Bouldin v. State,* 276 Md. 511, 515–16, 350 A.2d 130 (1976)). The weight given to an officer's subjective intent, as revealed (at least in part) by his testimony at the

5. Unlike in this case, the officer in *In re Albert S.* was not wearing a Montgomery County Police uniform.

suppression hearing, will depend upon his objective conduct. When an officer's intent is plainly demonstrated by his objective conduct, a court need not give significant weight to his or her subjective intent. *Id.* (citing *Belote v. State*, 411 Md. 104, 117, 981 A.2d 1247 (2009)). The defining feature of an arrest is the detention or restraint of an individual through the use of force, or by the individual's submission to authority. *See California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) ("An arrest requires *either* physical force ... or, where that is absent, *submission* to the assertion of authority.") (emphasis in original); *Longshore v. State*, 399 Md. 486, 502, 924 A.2d 1129 (2007) ("[G]enerally, a display of force by a police officer, such as putting a person in handcuffs, is considered an arrest."); *Bouldin, supra*, 276 Md. at 515–16, 350 A.2d 130 ("It is generally recognized that an arrest is the taking, seizing, or detaining of the person of another (1) by touching or putting hands on him; (2) or by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest; or (3) by the consent of the person to be arrested.").

To be reasonable and therefore valid under the Fourth Amendment, a warrantless arrest must be supported by probable cause. Probable cause "exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Longshore*, 399 Md. at 501, 924 A.2d 1129 (internal quotation marks omitted) (citations omitted).

In *Terry v. Ohio, supra*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, the Supreme Court recognized that some circumstances may necessitate a police response even when the probable cause necessary to effectuate an arrest is lacking. Specifically, the Court reasoned:

there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer [and bystanders], where he has reason to

believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

*Id.* at 27, 88 S.Ct. 1868.

The Court circumscribed the scope of such a search in accordance with its limited purpose: "The sole justification of the [*Terry*] search ... is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Id.* at 29, 88 S.Ct. 1868. In addition, the Court noted that the reasonableness *vel non* of the officer's action must be judged by looking "not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* at 27, 88 S.Ct. 1868. This reasonable suspicion standard is less demanding than probable cause, requiring only "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Longshore*, 399 Md. at 507, 924 A.2d 1129 (citations omitted). *See also United States v. Sokolow*, 490 U.S. 1, 7–8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (stating that "the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause" and that the existence of a "reasonable suspicion" must be judged by " 'the totality of the circumstances—the whole picture.' " (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981))).

As is evident from the Court of Appeals's recent discussion in *Bailey*, the core standards governing a *Terry* frisk remain unchanged:

The purpose of a protective *Terry* frisk is "not to discover evidence, but rather to protect the police officer and bystanders from harm." Pat-down frisks are proper when the

officer "has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." The officer has reason to believe that an individual is armed and dangerous if a reasonably prudent person, under the circumstances, would have felt that he was in danger, based on reasonable inferences from particularized facts in light of the officer's experience.

*Bailey,* 412 Md. at 366–67, 987 A.2d 72 (quoting *Longshore,* 399 Md. at 508–09, 924 A.2d 1129) (internal citations omitted).

Although the use of force is generally the hallmark of an arrest, in some instances a *Terry* stop will justify the use of force without elevating the encounter to an arrest. *See Bailey,* 412 Md. at 372 n. 8, 987 A.2d 72 (stating that "even if the officers' physical actions are equivalent to an arrest, the show of force is not considered to be an arrest if the actions were justified by officer safety," and citing cases in which force was applied to effectuate a limited *Terry* stop). Indeed, as the motion court in this case observed, "the permissible scope of a *Terry* stop has expanded in the past few decades" to allow police officers to use, during an investigative detention, "measures of force such as placing handcuffs on suspects, placing the suspect in the back of police cruisers, drawing weapons, and other forms of force typically [associated with] an arrest." *Longshore,* 399 Md. at 509, 924 A.2d 1129 (citing *United States v. Tilmon,* 19 F.3d 1221, 1224–25 (7th Cir. 1994)). Nevertheless, "Maryland has recognized very limited instances in which a show of force, such as placing a suspect in handcuffs, is not an arrest." *Id.* The circumstances in which Maryland appellate courts have allowed arrest-level force during a *Terry* stop include (1) to protect the officer(s) and/or bystanders, and (2) to prevent a suspect's flight. *Id.* (citing, respectively, *In re David S.,* 367 Md. 523, 789 A.2d 607 (2002), and *Trott v. State,* 138 Md.App. 89, 770 A.2d 1045 (2001)).

Even under these scenarios, there is no bright line marking the point at which a *Terry* stop and frisk rises to the level of an arrest. *Longshore,* 399 Md. at 509, 924 A.2d 1129.

Each case must be evaluated on its facts, accounting for the totality of the circumstances. *Id.* at 515–16, 924 A.2d 1129. Relevant considerations in addition to the application of force include, but are not limited to, the "length of detention[;] the investigative activities during · the detention [including its scope][;] and whether the suspect was removed to a detention or interrogation area." *Id.*

 Before applying these standards to the circumstances in this case, we first must address the State's preservation argument. The question whether, when the officers removed the appellant from the concession line and placed him against the pillar in a frisk position, they effectuated an arrest, plainly was raised in and decided by the motion court, and hence was preserved for review. *See* Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide any [non-jurisdictional] issue unless it plainly appears by the record to have been raised in or decided by the trial court. . . ."). As the appellant notes in his reply brief, defense counsel argued that the officers could not "make an arrest based on anything less than probable cause. And in this instance what they did was . . . immediately . . . [take] him out of line involuntar[ily] . . . [and] put him up against a wall." Defense counsel later added that the officers "were actually conducting a full-scale police action against [the appellant] as if they had probable cause." The prosecutor also understood that the appellant was arguing that he was arrested, responding "this was not an arrest, this was not a detention. This was just a *Terry* stop." The motion court in turn addressed the issue at the outset of its ruling, stating that the use of force in removing the appellant from the line was "irrelevant legally . . . because [the incident] [was] only . . . a *Terry* stop." Thus, the appellant's argument that he was unlawfully arrested is properly before this Court.

 The appellant stakes his claim of unlawful arrest on the fact that the officers forcibly removed him from the concession line and placed him against the pillar. Indeed, the motion judge found that the officers "grabb[ed] [the appellant] by both arms, or one arm, and escort[ed] him over to [the]

pillar ... and search[ed] him." The motion judge commented that he was "surprised" and "disturb[ed]" by this level of force, and questioned why the officers did not first question the appellant about the accusation that he had threatened someone with a knife. According to the appellant, arrests have been found "in cases where the police used much less force against potentially more dangerous individuals than in [his] case." Specifically, he cites *Morton v. State,* 284 Md. 526, 397 A.2d 1385 (1979), and *Grier v. State,* 351 Md. 241, 718 A.2d 211 (1998).

In *Morton,* the defendant was stopped and frisked by a police officer acting on a tip that Morton had participated in an armed robbery the day before. The officer found no incriminating evidence and told Morton he was free to leave. Morton nevertheless remained under police observation. A short time later, the police received information that Morton " 'may have been wanted,' " prompting them to surround a recreation center they had seen Morton enter. 284 Md. at 528, 397 A.2d 1385. The officer who had earlier frisked Morton confronted him inside the recreation center, told him " 'that he may have been wanted for something,' " and escorted him outside where he was placed in a patrol car containing another officer. *Id.* The officer then returned to the recreation center to search for a jacket and plastic bag that had been in Morton's possession during their first encounter. When the officer found and searched the bag, he discovered a handgun and narcotics inside. The Court of Appeals concluded that the defendant had been arrested when he was removed from the recreation center and placed under guard in the patrol car, and that the arrest was illegal because, at the time, the officer possessed only "unparticularized information giving rise to a suspicion that [Morton] was guilty of an unspecified crime." *Id.* at 530–31, 397 A.2d 1385.

In *Grier,* two patrolling officers observed Grier in a struggle with another man. As they turned their car around and approached the scene, the struggle ceased and Grier began walking away. When the officers reached the other person they found him "hysterical," and noticed he had a deep cut on

his hand. 351 Md. at 245, 718 A.2d 211. That person told them that Grier had attacked him and stolen his backpack (there was no mention of a weapon). The officers pursued Grier down an alley where they noticed him throw something on a porch. When Grier emerged from the alley, an officer " 'put him on the ground and took . . . him into custody.' " *Id.* The Court concluded that there was no evidence of an initial investigatory detention; instead, Grier was arrested the moment the officer " 'got' " him. (The issue in that case was not the lawfulness of the arrest, or whether an arrest took place, but whether there was admissible evidence of pre-arrest silence.)

The appellant's attempt to compare his case with *Morton* and *Grier* fails because he is viewing the use of force in isolation, without accounting for the surrounding circumstances in each case. As the appellant himself acknowledges, and as noted above, Maryland caselaw has recognized two circumstances in which officers may use arrest-force during a *Terry* stop without effectuating an arrest; one such circumstance being the *Terry* frisk of a suspect who officers reasonably believe is armed and dangerous, and therefore poses a threat to their safety. *See In re David S., supra,* 367 Md. 523, 789 A.2d 607.

In *In re David S.,* an officer observed the juvenile defendant, David S., walking with a suspected drug dealer. The pair stopped in front of an abandoned, boarded up building, with a "no trespassing" sign posted in front. David S. walked to the back of the building while his companion stayed in front and scanned the surroundings. When David S. returned, the officer observed him stuff an object the officer believed was a handgun into the waistband of his pants. As David S. and his companion walked away, they were stopped by four officers. With guns drawn, the officers ordered the pair to lie on the ground and then placed them in handcuffs. The officer who had observed what he thought was a handgun then rolled David S. over and touched his waistband. Feeling a hard object, the officer pulled up David S.'s tucked-in shirt and saw a black object protruding from his pants. The officer grabbed

the object and discovered it was a black plastic bag containing both a handgun and cocaine.

The Court of Appeals held that the evidence recovered from the black plastic bag was not the product of an arrest. The Court concluded that the officer's observations, which included a potential burglary and the brandishing of what looked like a handgun, were sufficient to give him a reasonable, articulable suspicion that criminal activity was afoot, and to perform a *Terry* stop of the suspects. Addressing the use of force, the Court noted that by drawing their weapons and handcuffing the suspects, the officers did not *per se* elevate the encounter to an arrest requiring probable cause. The Court explained that, in deciding whether there had been an arrest, it was required to examine the "totality of the circumstances" and assess the reasonableness of the officers' response, " 'balanc[ing] the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion.' " *Id.* at 536, 789 A.2d 607 (quoting *Lee v. State*, 311 Md. 642, 661, 537 A.2d 235 (1988)). Applying these principles, the Court concluded that the officers' " 'hard take down' " of David S. was "a legitimate *Terry* stop, not tantamount to an arrest," and that the officers' conduct, though a "severe . . . intrusion," was "not unreasonable because the officers reasonably could have suspected that [he] posed a threat to their safety." *Id.* at 539–40, 789 A.2d 607 (quoting *Lee*, 311 Md. 642, 537 A.2d 235).

Similarly, in *Lee, supra*, 311 Md. 642, 537 A.2d 235, police were on the look-out for two suspects involved in a robbery and shooting. They received a call from an unknown informant advising them that he had heard the suspects boasting about a robbery. The informant further said that the suspects were headed to an outdoor recreation area containing tennis and basketball courts so they could buy drugs, and would have with them a small blue bag containing a handgun. The unknown informant also gave a detailed description of the clothing the suspects would be wearing.

When police arrived on the scene, they observed the suspects among a group of people shooting baskets. Both suspects were dressed exactly as the informant had described, and, after several minutes of observation, the defendant was seen carrying the gym bag, which he hung on a fence near the basketball court.[6] Six officers converged on the scene with weapons drawn and ordered the entire group of five people, including the suspects, to lie on the ground. All five men were patted down, and the bag was searched and found to contain a gun.

The Court held that the "hard take down" performed by police—charging across the courts with weapons drawn and ordering the individuals to the ground—was an investigatory detention supported by a reasonable, articulable suspicion that criminal activity was afoot; it was not an arrest requiring probable cause. The Court reasoned that the information supplied by the informant combined with the corroborating observations by the officers furnished the reasonable suspicion necessary to support a *Terry* stop. As to the use of force, the Court explained:

> By ordering all of the basketball players to the ground through a show of firearms, the police not only made it more difficult for [the suspects] to reach for the bag [which was much closer to them than it was to the police] but also put the three bystanders in that position which would be safest, relatively speaking, if [the suspects] began shooting.

*Id.* at 666–67, 537 A.2d 235. Accordingly, the Court held that the "very brief, though forceful, detention of the [suspects] was constitutionally justified by reasonable suspicion under the circumstances." [7] *Id.* at 667, 537 A.2d 235.

---

**6.** During that time, an individual identifying himself as "Kevin" called the police and told them the suspects were preparing to leave, and that the bag containing the gun was hanging on split rail fence near the basketball court.

**7.** The Court further concluded that the police obtained probable cause to arrest the suspects when one of the officers grabbed the bag and felt

The common denominator in *David S.* and *Lee* is that the officers possessed a reasonable articulable suspicion that the suspects were armed and dangerous, and posed a threat to their safety and the safety of bystanders. Thus, the use of force ordinarily associated with an arrest was justifiable during the execution of the *Terry* stop. In *Morton* and *Grier,* the cases relied upon by the appellant, the officers had no specific information that the suspects were armed or posed a threat to the officers' safety at the time they were detained. Thus, the application of force under the circumstances in those cases elevated the encounter to an arrest.[8]

In the case at bar, the officers were approached by a movie theater patron who identified himself and told the officers that, while he was standing in line to purchase concessions, someone in the line who he believed was intoxicated had threatened him with a knife. The patron then pointed to the appellant as the person who had threatened him. When the officers approached the appellant, they smelled the odor of alcohol, which partially corroborated the patron's report. The appellant was not in an isolated location where he posed no threat to bystanders; he was instead standing in a line of people at a crowded movie theater. Thus, when the officers approached the appellant, it was reasonable for them to believe that he might try to threaten them with a knife, and that he posed a threat not only to their own safety but also to the safety of the many bystanders in close proximity. Accordingly, the circumstances in the case *sub judice* more closely resemble those in *David S.* and *Lee* than those in *Morton* and *Grier.* We agree with the motion court that the officers did

---

it weighted down by what must have been a gun (based on the informant's insistence that the bag contained a gun).

**8.** The appellant's analogy to *Bailey, supra,* 412 Md. 349, 987 A.2d 72, fails for the same reason. In that case, the Court concluded that the officer conducted "a general exploratory search" of the suspect (leading to the discovery of a vial of PCP) without any "objective reason to suspect that the [suspect] was armed and dangerous." *Id.* at 374, 987 A.2d 72. Accordingly, the search "was only valid if it was undertaken within the context of an arrest ... supported by probable cause." *Id.*

not effectuate an arrest of the appellant when they moved him out of the concession line and placed him against the pillar.

■ As noted above, the appellant asserts that, even if a *Terry* stop and frisk was justified under the circumstances, the scope of the intrusion (as judged by the level of force applied) exceeded what was warranted. The appellant supports this argument by noting the motion judge's misgivings about the amount of force used, and his suggestion that the officers could have first questioned the appellant before escorting him to the pillar. As the Supreme Court has cautioned, however, when engaging in Fourth Amendment analysis, judges must focus on the reasonableness of police action under the circumstances rather than on their own "Monday-morning" quarterback evaluations:

> A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

*United States v. Sharpe*, 470 U.S. 675, 686–87, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (citations omitted) (quotation marks omitted).

Here, the motion judge properly put aside his personal feelings and objectively assessed the officers' conduct based on all the circumstances. We agree with his conclusion that, under the circumstances in this case, the officers had reasonable, articulable suspicion to perform a *Terry* stop of the appellant, and the amount of force applied by the officers in doing so was constitutionally justified.

■ Before turning to the appellant's assertion that the officers' search went beyond the scope of a permissible *Terry* frisk, we shall address his argument that the report by the "anonymous" informant was insufficient to provide the officers

a reasonable articulable suspicion for a *Terry* stop. The appellant claims that the information given by the "unknown tipster" lacked the necessary "indicia of reliability" because it was uncorroborated by the officers' observations, and was potentially the work of a "mischief maker." This argument, however, is based on an incorrect factual predicate.

 The movie theater patron who reported the appellant to the officers was not an anonymous tipster; he was the victim of an assault who personally reported the incident to the officers and supplied his name, Carlos Feliz–Arias. Although Arias did not appear in court at the suppression hearing, he was subpoenaed as a witness and was repeatedly referred to by name at the hearing (including by defense counsel). His failure to appear, and the fact that the officers did not record his name in a report or take a written statement from him, did not render him "anonymous." Thus, we shall not apply the law governing anonymous tips to the report given to the officers in this case. *See, e.g., Florida. v. J.L.,* 529 U.S. 266, 274, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (holding that an anonymous tip must have sufficient "indicia of reliability" to justify a stop and frisk).

Indeed, the Supreme Court in *J.L.* distinguished the anonymous informant from one "whose reputation can be assessed and who can be held responsible if her [or his] allegations turn out to be fabricated." *Id.* at 270, 120 S.Ct. 1375. By personally reporting the incident to the officers and giving them his name, Arias was exposing himself to potential liability for making a false report.[9] Moreover, the officers' face-to-face interaction with Arias allowed them to assess his demeanor, and evaluate whether he was a potential "mischief maker." *See also Cross v. State,* 165 Md.App. 164, 187, 884 A.2d 1236 (2005). Thus, we conclude that Arias's report and identification gave the officers a "particularized and objective basis for suspecting criminal activity," *Longshore, supra,* 399 Md. at

---

**9.** That the officers chose not to obtain any written information from him and allowed him to walk away after identifying the appellant does not diminish this fact.

507, 924 A.2d 1129, by the appellant sufficient to support a *Terry* stop.

Finally, we turn to the appellant's argument that, even if the officers had a reasonable suspicion to perform a *Terry* stop and to frisk him for weapons, the search of his pocket exceeded the permissible scope of a *Terry* frisk. As noted, "[t]he sole justification of [a *Terry* frisk] is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, *supra*, 392 U.S. at 29, 88 S.Ct. 1868. A *Terry* frisk ordinarily is limited to a pat-down of the outer clothing. The frisk may extend beyond that point if circumstances warrant more intrusive measures:

> "The reasonableness of a *Terry* stop and frisk ... must be assessed on a case-by-case basis. In any event, the proper balance between the sometimes competing interests of the police officer and the individual requires that the police officer employ the least intrusive means of discovering and neutralizing any concealed weapons. While a pat-down of the outer surface of a suspect's clothing is typically the least intrusive method, a more intrusive frisk may be warranted in the appropriate circumstance."

*McDowell v. State*, 407 Md. 327, 340, 965 A.2d 877 (2009) (quoting *State v. Smith*, 345 Md. 460, 468, 693 A.2d 749 (1997)) (alteration in original). When an officer employs a more intrusive search method, he must be able to "explain why it was necessary to conduct [the more intrusive] search or ... demonstrat[e] ... that a pat-down would not have revealed the presence or absence of a weapon." *Id.* at 341, 965 A.2d 877.

One circumstance that may justify a more intrusive search is when the initial pat-down reveals a potential weapon. *Smith*, *supra*, 345 Md. at 469, 693 A.2d 749 ("Where the pat-down reveals a hard object that the police officer reasonably believes may be a weapon, the officer may further intrude

upon the individual to the extent necessary to seize the suspected weapon." (citing *Terry*, 392 U.S. at 30–31, 88 S.Ct. 1868)). *See also Aguilar v. State*, 88 Md.App. 276, 287, 594 A.2d 1167 (1991) ("[I]f the pat-down reveals a hard object which could be a weapon, a further search is allowed.").

In *Smith*, an officer responded to a dispatch report that a group of people were firing weapons and selling drugs. When the officer arrived on the scene, he noticed the defendant, Smith, tuck what the officer believed was a handgun into the waistband of his pants as the group dispersed. The officer detained Smith and performed a *Terry* frisk for weapons. After feeling nothing that suggested Smith was armed, the officer proceeded to "double-check[ ]" his pat-down by asking Smith to pull his shirt back to reveal the waistband area. 345 Md. at 463, 693 A.2d 749. When Smith complied, a bag of cocaine fell to the ground.

The Court of Appeals affirmed this Court's holding that the officer exceeded the permissible scope of a protective frisk when he ordered the suspect to untuck his shirt. The Court noted that the officer's failure to detect anything in the initial pat-down was "crucial to [its] decision," because, "[u]pon feeling nothing in patting down Smith, [the officer] no longer had the same suspicion that Smith was armed and dangerous, and thus had no legal basis for escalating his search." *Id.* at 469–71, 693 A.2d 749; *accord Aguilar, supra*, 88 Md.App. at 287, 594 A.2d 1167.

In *Aguilar*, we summarized additional limitations on a police officer's right to extend a search beyond the initial pat-down:

> If an officer pats a person's clothing and feels only a soft object, a further search is not allowed. *Anderson v. State*, 78 Md.App. 471, 487, 553 A.2d 1296 (1989). Where the patdown discloses a hard object, but the officer can determine from the shape of the object that the object is not a weapon, a further search is not allowed. *Alfred v. State*, 61 Md.App. 647, 487 A.2d 1228 (1985). . . . Finally, we pointed out in *Anderson v. State, supra*, that an officer may not, without first conducting a pat-down, reach into a suspect's

pocket and remove hard objects simply because the officer has a reasonable basis to believe that the suspect is armed. 88 Md.App. at 285–86, 594 A.2d 1167.

■ When, however, an officer feels a hard object he *reasonably believes* is a weapon, he may extend the search beyond the outer portion of the clothing even if he is not *certain* the object is a weapon. As the Court of Appeals explained in *In re David S., supra,* 367 Md. at 541–42, 789 A.2d 607:

> [The officer] testified that, after touching the area for a second or two, he believed it was more likely that [the defendant] was carrying a gun than drugs or the proceeds of a burglary. [The officer] said "it was a solid object, there was no softness to it, or anything, it was just very hard."
>
> [The defendant] contends that [the officer] could not lift his shirt because the officer was not certain whether he was carrying a gun. *Terry* does not require a police officer to be certain that a suspect is armed in order to conduct a frisk for weapons. All that is required is a reasonable suspicion that the person is armed and dangerous. . . .
>
> * * *
>
> *Smith* [and other cases where an initial pat-down that revealed nothing that might have been used as a weapon against the police officer] [are] distinguishable. . . . Here, based on [the officer's] observations, there was a substantial possibility that [the defendant] was armed and dangerous. After frisking [the defendant] and feeling a hard object that may have been a handgun, [the officer] had even more reason to believe [the defendant] was carrying a gun. Given that [the officer] felt what he believed might have been a gun, a belief consistent with what he had seen earlier, [he] was not precluded from lifting [the defendant's] shirt.

We likewise view as distinguishable *Smith* and related cases in which the initial pat-down did not reasonably indicate that the suspect was carrying a weapon. As Sergeant Liquorie explained, "as I patted down [the appellant's] left front pant pocket, I felt an object at the bottom of the pocket that I

believed could possibly be a folded knife." Although the object turned out to be a lighter, from the outside of the appellant's clothing it felt "similar or roughly the same" as a folded knife, according to Sergeant Liquorie. Moreover, the sergeant explained that his suspicion was heightened by Arias's report that the appellant had brandished a knife and by the appellant's intoxicated state, which conformed to Arias's description. Thus, under these circumstances, Sergeant Liquorie "believe[d][he] had to investigate further to corroborate if, in fact, there was a knife [in the appellant's] pocket." Sergeant Liquorie's assessment was reasonable given the facts before him. Accordingly, his search of the appellant's pocket was proper.

The appellant asserts that the object in his pocket "was not an item that could [have been] accessed without some difficulty and it could not have easily been used to assault the investigating officers." The appellant additionally claims that Sergeant Liquorie improperly "squeezed and manipulated" the lighter without knowing whether it was a weapon. He argues that, under *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), an officer may "probe the contour or mass of an unseen but felt object only until he negates the possibility that the suspect possess an obvious weapon that could be used to harm the officer."

First, a knife placed in a front pants pocket is no more difficult to access than a gun tucked into a waistband. Furthermore, a folded knife could quickly be unfolded and used as a weapon. In fact, the officers had reason to believe that the suspected knife was readily accessible based on Arias's report that the appellant had displayed a knife after the two bumped into each other in line.

Second, nothing in *Dickerson* precluded Sergeant Liquorie from manipulating the lighter through the exterior of the appellant's pants to determine whether the object was a weapon. *Dickerson* addressed the question, not disputed here, "whether police officers may seize nonthreatening contraband detected during a protective patdown search of the

sort permitted by *Terry." Id.* at 373, 113 S.Ct. 2130. In answering this question, the Court wrote, *"Terry* itself demonstrates that the sense of touch is capable of revealing the nature of an object with sufficient reliability to support a seizure. The very premise of *Terry,* after all, is that officers will be able to detect the presence of weapons through the sense of touch and *Terry* upheld precisely such a seizure." *Id.* at 376, 113 S.Ct. 2130. Thus, to the extent Sergeant Liquorie "manipulated" the object through the outer portion of the appellant's clothing,[10] and that probing of the object led him to reasonably believe it was a weapon, both the palpation of the object and the extension of the search into the appellant's pocket were proper under *Terry.*

Sergeant Liquorie discovered the bag of narcotics in the appellant's pants pocket when he inserted his hand in the pocket to remove what he reasonably believed was a folding knife. His testimony established that he recognized crack-cocaine in the baggie that he encountered while legitimately searching the pocket for a knife. Under the circumstances, the sergeant's seizure of the baggie containing crack-cocaine did not violate the Fourth Amendment. *See, e.g., Michigan v. Long,* 463 U.S. 1032, 1050, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) ("If, while conducting a legitimate *Terry* search . . ., the officer should . . . discover contraband other than weapons, he [is not] required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances.").

## II. & III

### The Second Trial

The appellant's second and third contentions challenge, respectively, the admission during his retrial of a chemist's report establishing that the substance in the baggie in his

---

**10.** Sergeant Liquorie did not testify that he "manipulated" the object. Rather, in explaining why he mistook a lighter for a folded knife, he stated that "it was hard to manipulate anything through the exterior of the pants [because they were thick sweat pants]."

pants pocket was crack-cocaine and the former testimony of two witnesses from his first trial.[11] The facts relevant to these issues are as follows.

On February 28, 2008, five days before the second trial was scheduled to start, the appellant filed an unopposed motion for continuance. The motion explained that defense counsel had a family emergency that required her to travel out of the area, and as a result, she would either be unavailable for the start of trial or, if available, would be unprepared to try the case on the scheduled start date. The prosecutor, assuming the motion would be granted, released her witnesses. The continuance instead was denied by order entered March 3, 2008, the day before the start of trial. Consequently, none of the prosecution's witnesses were present at the start of the second trial on March 4, 2008.[12]

At the outset of the proceedings on March 4, 2008, the prosecutor informed the court that her "two officers were teaching all day today" and "[w]hat [she had] for the Court" was "a chemist" (referring to the chemist, Susan Cohen, who performed the analysis on the narcotics recovered from the appellant). The Court warned the prosecutor not to assume that a continuance would be granted, and asked if she had any witnesses. The prosecutor responded that she would have witnesses available at 1:30 p.m., and asked the court to give her until then to procure them. Defense counsel responded by noting her client's "fundamental right to go forward" and that she (counsel) had "rush[ed] back [from her family emer-

---

**11.** We shall address these contentions in reverse order.

**12.** As the prosecutor later explained the situation at the sentencing hearing:

> I had, frankly, released everybody, and it was my fault, and I accepted full responsibility for that. It was, I have been practicing here forever, and frankly, I've never known [the judge who issued the order] to deny a continuance under those circumstances.
>
> And so it was, and I guessed wrong, and I released all my witnesses. My officers all were working midnight shifts all weekend, so I just released them. And I was in a position of going, bringing in a jury in about half an hour with not a witness under subpoena, and trying to call everyone. . . .

gency] ... for trial." The court stated that it would give the prosecutor until 1:30 p.m. "[i]f it works out," but added that "[w]e're not going to rush the voir dire ... [s]o we'll be all right."

As the parties and the judge were discussing proposed *voir dire* questions, the prosecutor returned to the subject of the chemist, saying, "I have listed the chemist as a witness. I may be submitting her testimony from the previous trial. I have not verified that she is, in fact, available, so ... I'm not sure she'll be testifying." The discussion of *voir dire* then resumed, and the court proceeded with jury selection.

When the proceedings resumed after jury selection and an afternoon recess, the prosecutor moved to introduce the former testimony of the chemist and of Officer Pete Duggan, "pursuant to the ... exception allowing the introduction of hearsay evidence which is former testimony." The prosecutor added that both witnesses had testified at the first trial and had been cross-examined. The court asked if the prosecutor was arguing that the testimony was admissible under Rule 5–802.1 and she replied, "[t]hat would be correct." (Throughout the discussion that followed, the trial judge and the prosecutor mistakenly referred to the rule governing the admissibility of prior testimony as Rule 5–802.1, when in fact their discussion clearly concerned Rule 5–804(b)(1).[13]). Defense counsel objected, and the court asked that she state her grounds. Defense counsel answered:

> The grounds would be that I was—even though this person testified at the prior trial, I was not that counsel in that trial. I'm new counsel.

> And I reviewed the testimony. I've had the transcripts prepared and I've reviewed the testimony, and I have not had an opportunity—my client, [through] me as his new lawyer, has not had an opportunity to cross-examine these witnesses.

---

**13.** Rule 5–802.1 addresses the admissibility of an out-of-court statement by a witness who testifies at trial. Rule 5–804 lists hearsay exceptions for a witness who is "unavailable" to testify at trial.

And there is questioning that I would have asked differently. There's questions that I would have asked that were not asked.

I mean, I would have conducted cross-examination in a different way. I would have asked, for instance, a significant—more questions of the chemist, in particular, regarding her procedures, her processes, et cetera. That was not done in the first trial.

The court responded by noting that prior counsel had obtained an acquittal on the second count, and a hung jury on the first count, "[s]o [it was] not exactly ineffective assistance of prior counsel." The court then asked why it was "not permissible [to admit the former testimony] under the rule" and why it was a violation of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), if that is what defense counsel was contending. Defense counsel replied, "Because this is a new trial, Your Honor." The colloquy then proceeded as follows:

THE COURT: Correct. But the rule, 5–802.1, was enacted by the Court of Appeals Rules Committee, which makes not excludable by the rule against hearsay.

Now, that doesn't mean as to any particular question or answer, you don't have a good objection. And I might rule differently than another trial judge. Who knows.

Two prerequisites are, one. Prior declarant had to testify at trial, be sworn, all that stuff.

[DEFENSE COUNSEL]: Right.

THE COURT: And be subject to, you know, fulsome cross-examination. So I'm perceiving no violation of 5–802.1, nor am I perceiving a violation of *Crawford v. Washington*, because obviously its testimonial, but there was an opportunity to cross-examine.

... I understand that you're a different counsel, and we all—all lawyers like think that they would do it different, better. And you may be right. But would you not have also available to you the ability to subpoena these individu-

als, to the extent that you have additional questions. I would give you latitude.

. . .

[DEFENSE COUNSEL]: Well, there is, I guess, an opportunity for—well, not really, Your Honor, because from what I understand from the State, these witnesses—

THE COURT: See, if I were you, I'd almost rather have their prior testimony. Subpoena them. Call them again. And then—I could have a field day.

I don't even care what they testify about. It doesn't matter. But I'm saying the Court would afford you an opportunity to subpoena the witnesses if you wanted to, and I would assist the defendant in serving the subpoenas and making sure the persons showed up.

So you would have the opportunity, live. I take it this would not be a problem [asking the prosecutor].

[THE PROSECUTOR]: No, Your Honor.

\* \* \*

THE COURT: In other words, what I'm saying is, even though the rule doesn't require it. Even though the Sixth Amendment as interpreted by the Supreme Court doesn't require it, (unintelligible) still would exercise it's discretion in favor of the defendant. So if you wanted the witness to show up, and I'll call her as a Court witness so there'll be no prejudice as to why she's here, or (unintelligible).

I'll tell the jury the Court is calling her as a witness because—I'll just say, the lawyers have some questions. And then I'll let you have at it.

So, in light of that, why would you be prejudiced? In other words, you get two bites.

[DEFENSE COUNSEL]: Well, that's only if the witnesses are able to be here. We're able to get them here. It's my understanding they're not available today.

THE COURT: They're not available today, but I will bring them tomorrow. I'll have a subpoena issued. I'll

have it—if necessary—it probably won't be necessary—served by sheriffs. They'll show up for you.

The judge then suggested that defense counsel might want to wait and make a decision based on how the jury reacted when the former testimony was read into the record. Defense counsel responded that her client would be prejudiced "due to the fact that reading the testimony has a far different effect ... on the jury ... than live testimony." The judge disagreed, stating that in his past experience, jurors usually did not pay attention when testimony was read into the record. The court concluded that, unless defense counsel could point to specific deficiencies in the cross-examination of the witnesses demonstrating ineffective assistance of counsel, the former testimony was admissible and, accordingly, it would grant the State's motion.

The court then repeated its offer to subpoena the witnesses if defense counsel desired live testimony. After defense counsel accepted the offer, the judge asked the prosecutor to assist him in locating the witnesses. The prosecutor stated that Officer Duggan was not available that day because of an emergency, but he could be there tomorrow. The prosecutor further stated that the chemist had not responded to counsel's telephone calls and e-mails, but that "she [the chemist] works odd hours" and that the prosecutor would call again as soon as the court took a break. The court then took a recess to allow defense counsel to confer with her client on the matter.

When the proceedings resumed, defense counsel informed the court that she had spoken to her client and that if the court was going to assist in procuring the witnesses, the appellant wanted to take the opportunity to subpoena them even though they had not decided whether to actually call the witnesses. The prosecutor then returned to the courtroom and explained that the chemist was on vacation until March 10, but that her supervisor was available to testify the following day (March 5). The prosecutor also stated that the narcotics could be retested if that is what defense counsel wanted (defense counsel declined). Finally, the prosecutor

stated that she had not received a demand that the State produce the chemist, and asked for verification that it was in the docket entries.

When the court asked defense counsel whether she had filed a demand, defense counsel stated that she had not, but that prior counsel had.[14] The court asked if it was necessary to file a new demand for the new trial. The prosecutor answered that it was her understanding that a new demand indeed had to be made before a new trial, and that, without a demand from defense counsel, the testimony of the chemist was not required. Defense counsel restated her position that the demand made during the prior trial applied to the new trial. After further discussion, the court asked for guidance on how defense counsel wished to proceed. Defense counsel reiterated her desire to have the witnesses appear in court. The judge then made his ruling:

> [M]y ruling is that the State may use the prior testimony, subject to objection as to a particular question. The State will make the policeman, the police officer and the supervisor available [the next day].
>
> ... I'll make them come here, and then if you want to put them on [after seeing the jury's reaction to the transcripts], the Court will call them as its witnesses, and if you don't, I'll thank them kindly, and they'll go about their business.

Following opening statements, the trial judge explained to the jurors that they were about to have testimony read to them that had been given under oath and subject to cross-examination. The State then called Corporal John Sissle of the Montgomery County Police Department. After Corporal Sissle explained that he was a liaison between the Police Department and the State's Attorney's Office, and clarified that he was not Officer Duggan, the transcript of Officer Duggan's testimony was offered into evidence. Defense coun-

---

14. Prior defense counsel filed a notice on April 4, 2007, requesting that the State call the chemist as a witness at the first trial.

sel stated that she had no objection "other than [her] previous objection."

The court responded that it was making the "[s]ame ruling," and accepted the transcript. The transcript was then read into evidence, with the prosecutor reading the questions and Corporal Sissle reading the responses by Officer Duggan. Defense counsel objected when, during the course of reading Officer Duggan's testimony, the State attempted to introduce photographs of the narcotics that had been authenticated by Officer Duggan at the first trial. Defense counsel argued that the narcotics could not be authenticated by reading the testimony of a witness who was not in court. As she explained, "the officer's [sic] not here to look at these actual documents to testify that these are the same ones that he looked at." The court overruled the objection, but added that it would strike the photographs if there was some indication that they were not the same photographs introduced at the prior trial.[15]

When Officer Duggan's testimony had been completely read into evidence, the prosecutor introduced the transcript of the chemist's former testimony. Defense counsel noted her earlier objections and the court ruled as it had earlier. Corporal Sissle then read the chemist's testimony into the record. As with the photographs of the narcotics, the prosecutor used the chemist's former testimony as a basis to introduce the chemist's report and the narcotics, which the chemist had authenticated at the first trial. Defense counsel offered the "[s]ame objection" and the court made the "[s]ame ruling" admitting the items into evidence. No additional witnesses testified that day.

At the start of trial the following day, the prosecutor informed the court that she had made Officer Duggan available to the defense, and that defense counsel had interviewed him and concluded that his testimony was unnecessary. Regarding the chemist's supervisor, the prosecutor stated she could bring him to court, but that he was not present because

---

**15.** The appellant has not challenged this ruling on appeal.

defense counsel had decided she did not need his testimony. Defense counsel confirmed that she did not need the supervisor, but advised the court that she "really wanted [the chemist]." As a result, both witnesses were released without offering any live testimony.

### The Admission into Evidence of the Former Testimony of Officer Duggan and the Chemist

The appellant contends the trial court erroneously admitted the former testimony of Officer Duggan and the chemist because (a) the State did not demonstrate that either witness was "unavailable" to testify, as it was required to do under *Crawford v. Washington, supra,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, and (b) Rule 5–802.1 does not apply to the former testimony of a witness not present at trial.[16]

The State responds that the appellant's claim of a *Crawford* violation, including his argument that the State failed to show that the witnesses were unavailable, was not made below and therefore is not preserved for review. If preserved, the trial court's unavailability determination was not an abuse of discretion. With respect to the appellant's Rule 5–802.1 argument, the State again maintains that the argument is unpreserved. The State further asserts that the argument fails on the merits because, despite the court's reference to Rule 5–802.1, "it [was] apparent that the prosecutor actually sought to admit the testimony ... under Rule 5–804(b)(1)," and it was properly admitted under that Rule.

1. Admission of the prior testimony under *Crawford v. Washington*

A criminal defendant's right to confront adverse witnesses is guaranteed by the Sixth Amendment to the U.S. Constitution, which states in relevant part: "In all criminal prosecutions, the accused shall enjoy the right ... to be

---

**16.** He further asserts that the error was not harmless because a jury note indicates that "[t]he jury clearly considered the inadmissible hearsay and was confused by it."

confronted with the witnesses against him[.]" In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court newly interpreted the Confrontation Clause as allowing the admission of "testimonial statements" by witnesses absent from trial only when the declarant is unavailable and has previously been cross-examined by the defendant.[17] *Id.* at 59, 124 S.Ct. 1354; *see State v. Lucas*, 407 Md. 307, 311, 965 A.2d 75 (2009) ("In *Crawford* ... the Supreme Court held that the Confrontation Clause barred the 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' ") (quoting *Crawford*, 541 U.S. at 53–54, 124 S.Ct. 1354); *State v. Snowden*, 385 Md. 64, 78, 867 A.2d 314 (2005) ("[T]he Supreme Court fundamentally altered its Confrontation Clause jurisprudence when it decided *Crawford v. Washington* . . . .").

There is no dispute that the former testimony of Officer Duggan and that of the chemist were "testimonial" as that term was defined in *Crawford, see supra* n. 16; thus, for the former testimony of each witness to be admitted into evidence, the State was required to show that the witness (a) had been subject to prior cross-examination, and (b) was "unavailable" to testify at the trial. An unavailable witness includes one who "is absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance ... by process or other reasonable means." Md. Rule 5–804(a)(5). Although the State in the case at bar in fact failed to demonstrate that either witness was unavailable, we nonetheless agree with the State that the appellant did not preserve his unavailability argument for appellate review. We explain.

---

**17.** The Court "le[ft] for another day any effort to spell out a comprehensive definition of 'testimonial,' " but explained that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68, 124 S.Ct. 1354.

When the prosecutor moved to admit the former testimony of Officer Duggan and the chemist, defense counsel objected that she herself had not had an opportunity to cross-examine the witnesses and that the cross-examination of the witnesses at the first trial had been ineffective. Indeed, when the trial judge asked defense counsel to state the grounds for her objection, she responded that "[her] client, th[r]ough [her] as his new, lawyer, [had] not had an opportunity to cross-examine these witnesses," that there were questions she "would have asked differently," and questions that she "would have asked that were not asked." Moreover, when the trial judge invited defense counsel to object further under either *Crawford* or the Maryland Rules—"why is [the admission of the prior testimony] not permissible under the rule, and then why, if you're not contending it's a violation of *Crawford* . . . is it?"—defense counsel responded, "Because this is a new trial, Your Honor," and then persisted in her argument about live testimony,[18] without ever raising the issue of the witnesses' unavailability. *See Graves v. State,* 94 Md.App. 649, 675, 619 A.2d 123 (1993), *rev'd on other grounds by* 334 Md. 30, 637 A.2d 1197 (1994) ("Even though it is not necessary to state the grounds for objection to evidence, when counsel is requested by the trial court to articulate the reasons for that objection, he should state all his reasons for objecting. If in articulating the reasons for the objection counsel omits to state a particular ground, he is ordinarily regarded as having waived any basis not so stated." (internal quotation marks omitted) (citations omitted)).

Furthermore, to the extent any *Crawford* issue was "raised and decided" by the trial court, *see* Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]"), the court's *Crawford* ruling focused only on whether there had been a prior opportunity

---

18. Defense counsel did not specifically state a desire to conduct cross-examination, and was in fact amenable to the court's plan to call Officer Duggan and the chemist as "court witnesses."

for cross-examination—"I [am] perceiving no violation of *Crawford v. Washington,* because obviously it's [the prior testimony] testimonial, but there was opportunity to cross-examine." Although the trial judge repeated the comment made initially by defense counsel that the witnesses were "not available today [the first day of trial]," this was a colloquial exchange made in the context of a discussion regarding the court's plan to subpoena the witnesses. It was not a legal conclusion made for the purpose of admitting the prior testimony in conformity with *Crawford.* Accordingly, we hold that the appellant's unavailability argument was not preserved for appellate review, and, as such, we decline to address it. *See MCIC, Inc. v. Zenobia,* 86 Md.App. 456, 471, 587 A.2d 531 (1991) ("Defendants did not raise the issue of plaintiffs' failure to establish the unavailability of the witnesses at trial. The issue is waived and may not be raised for the first time on appeal."), *vacated on other grounds by* 325 Md. 420, 601 A.2d 633 (1992).

2. Admission of the Former Testimony Under the Maryland Rules

■ Rule 5–804(b) specifies exceptions to the hearsay rule for statements made by a declarant who is "unavailable as a witness." Relevant here, subsection (b)(1) governs the admission of former testimony of an unavailable witness:

> Former testimony. Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

As noted, however, the prosecutor offered the former testimony of the two witnesses, and the trial court admitted it, under Rule 5–802.1, which specifies hearsay exceptions for prior statements made by "a witness *who testifies at the trial or hearing and who is subject to cross-examination concerning the statement.*" (Emphasis added.)

Although it was clear from the discussion of the governing legal standard that the prosecutor and the trial judge were speaking of admitting the former testimony into evidence under Rule 5–804(b)(1) (despite their misstatements to the contrary), the appellant argues that we cannot hold the testimony admissible under that rule because the issue was never argued or decided below. To be sure, the appellant is correct that the testimony at issue could not properly have been admitted into evidence under Rule 5–802.1. Regardless, the appellant at no time objected to the admission of the testimony under Rule 5–802.1. As explained above, when asked to state the grounds for her objection to the admission of the testimony, and when later invited to explain why the testimony was inadmissible under either *Crawford* or "the rule," defense counsel did not argue that Rule 5–802.1 did not apply. Instead, she argued that she wanted the witness to appear in court so she could ask new and different questions than had prior trial counsel. Thus, the appellant's argument that the former testimony was inadmissible under Rule 5–802.1 is likewise not preserved for appellate review.

### The Admission of the Chemist's Report

Finally, the appellant contends the trial court erred in admitting into evidence the chemist's report on the narcotics recovered from his pants pocket. As with his argument concerning the former testimony, he argues that, to admit the chemist's report into evidence, the State was required under *Crawford* to show that the chemist was unavailable as a witness and that it failed to do so. He additionally argues that the court's admission of the report violated Md.Code (2006 Repl.Vol.), sections 10–1001 to 10–1003 of the Courts and Judicial Proceedings Article ("CJP") because (a) he submitted a written demand that the State produce the chemist in court, and (b) even if he did not submit such a demand, he was entitled to rely upon the State's witness list, which included the chemist.

The State's responses to the appellant's *Crawford* argument are the same as those made for the admission of the former

testimony: The appellant failed to preserve his unavailability argument, and, if preserved, the trial court's unavailability determination was not an abuse of discretion. As to the appellant's claimed violation of CJP section 10–1003, the State argues that the demand made by the appellant applied only to the first trial; and that his assertion that he was entitled to rely upon the State's witness list is (a) unpreserved, and (b) lacks record support.[19]

### 1. Admission of the Chemist's Report under *Crawford*

Recently, in *Melendez–Diaz v. Massachusetts*, —— U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), the Supreme Court held that forensic reports prepared for trial are "testimonial statements" of the type described in *Crawford* and, consequently, a criminal defendant is entitled under the Confrontation Clause to cross-examine the analyst absent a showing by the State that the analyst is unavailable and previously was subject to cross-examination by the defendant. *Id.* at 2532. Thus, as with the former testimony, the State was required to produce the chemist or demonstrate that she was unavailable in order to admit her report into evidence against the appellant (in addition to showing she was subject to prior cross-examination, which is not in dispute here). Nevertheless, the appellant has again failed to preserve his unavailability argument for appellate review.

When the prosecutor offered the report into evidence, defense counsel made the "same objections" as those made earlier, *i.e.* that she would have questioned the witness differently than had prior counsel at the first trial. At no time did defense counsel argue that the State was required to show that the chemist was unavailable when it sought to introduce her report.[20] *See* Md. Rules 8–131(a). *See also* Md. Rule 4–

---

**19.** The State also argues that any error in admitting the report without giving the appellant the opportunity to cross-examine the chemist was harmless because the appellant had such an opportunity at the first trial. We need not address that issue.

**20.** To the extent defense counsel's "same objections" included her earlier objection to the admission of the photographs through the

323 ("An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent."); *Graves, supra,* 94 Md.App. at 675, 619 A.2d 123; *MCIC, Inc. v. Zenobia, supra,* 86 Md.App. at 471, 587 A.2d 531.

## 2. The Admission of the Report Under State Law

 CJP section 10–1003(a)(1) provides that, "[i]n a criminal proceeding, the prosecution shall, upon written demand of a defendant filed in the proceedings at least 5 days prior to a trial in the proceeding, require the presence of the chemist, analyst, or any person in the chain of custody as a prosecution witness." [21] *See also Thompson v. State,* 80 Md.App. 676, 681, 566 A.2d 126 (1989) ("Sec. 10–1003 ... requires the State, upon written demand by the defendant, to produce the chemist, analyst, or any person in the chain of custody as a prosecution witness."). There is no dispute that the appellant did not file a demand prior to the retrial; rather, his argument that the State was required to produce the chemist in response to his demand rests on the written demand made in advance of his first trial. According to the appellant, his initial written demand applied to his second trial as well. The State asserts that the appellant's argument is "unreasonable" and "contrary to the plain language of the statute," which it argues treats every trial as an independent event requiring a separate written demand.

Our "primary goal" in matters of statutory interpretation is "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by [the provision in

reading of Officer Duggan's prior testimony, the appellant's unavailability argument remains unpreserved because defense counsel did not argue that the State was required to show that Officer Duggan was unavailable in order to admit the photographs.

21. Under CJP section 10–1001, a signed report stating that a particular substance offered into evidence is a controlled dangerous substance is *prima facie* evidence of that fact without the personal appearance in court of the chemist or analyst who performed the test and authored the report.

question]." *See, e.g., Burnside v. Wong,* 412 Md. 180, 194, 986 A.2d 427 (2010) (and cases cited therein) (internal quotation marks omitted). We start by looking at the plain meaning of the statutory text, and "[i]f the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends." *Id.* at 195, 986 A.2d 427. "If however, the language is subject to more than one interpretation, it is ambiguous, and we resolve that ambiguity by looking to the statute's legislative history, case law, and statutory purpose." *Barbre v. Pope,* 402 Md. 157, 173, 935 A.2d 699 (2007) (citations omitted).

CJP section 10–1003(a)(1) by its terms requires the defendant to file a written demand in every "criminal proceeding"; the question here is whether the retrial was a new "criminal proceeding" for the purpose of the demand requirement, or was instead a continuation of the prior proceeding. The State directs our attention *Hammersla v. State,* 184 Md.App. 295, 965 A.2d 912 (2009), as support for the former interpretation.

*Hammersla* involved the requirement in Md.Code (2002), section 2–203 of the Criminal Law Article that the State provide a defendant written notice 30 days before trial of its intent to seek a sentence of life imprisonment without the possibility of parole for a first-degree murder conviction.[22] The State provided Hammersla with timely written notice pursuant to CL section 2–203 prior to his first trial. That trial resulted in a conviction that was ultimately reversed on appeal by this Court, which remanded the case to the circuit court for further proceedings. Although the State again filed a notice under CL section 2–203 prior to Hammersla's second trial, it

---

**22.** CL section 2–203 states:

A defendant found guilty of murder in the first degree may be sentenced to imprisonment for life without the possibility of parole only if:

(1) at least 30 days before trial, the State gave written notice to the defendant of the State's intention to seek a sentence of imprisonment for life without the possibility of parole; and

(2) the sentence of imprisonment for life without the possibility of parole is imposed in accordance with § 2–304 of this title.

was submitted less than 30 days before the start of the trial, and therefore was untimely. The circuit court denied a motion to strike the untimely notice, ruling that the State was not required to refile under CL section 2–203. The court subsequently sentenced Hammersla to life in prison without the possibility of parole.

On appeal to this Court, we vacated the conviction, holding that the original notice was not effective as to the second trial. Citing *Gantt v. State*, 73 Md.App. 701, 536 A.2d 135 (1988), we noted that a "criminal proceeding consist[s], theoretically, of five stages: (1) the accusatory stage resulting in the filing of the indictment, (2) the stage at which any pretrial motions could be filed and resolved, (3) the actual trial on the merits of guilt or innocence, (4) the filing of the State's Attorney's notice of intention to proceed under mandatory sentencing procedures, and (5) the sentencing hearing itself." *Id.* at 311, 965 A.2d 912. We reasoned that "[t]he reversal of [Hammersla's] conviction, with an order for a new trial, 'wiped the slate clean,' and the case began anew procedurally," which, in the context of the five stages of a criminal proceeding, meant that the case returned to stage (2)—" 'the stage at which any pretrial motions could be filed and resolved.' " *Id.* at 313–14, 965 A.2d 912 (quoting *Gantt*, 73 Md.App. at 704, 536 A.2d 135). Accordingly, the State was required to timely refile a notice in order to seek a life sentence without the possibility of parole.[23]

---

**23.** By contrast, in *Gantt, supra,* 73 Md.App. 701, 536 A.2d 135, we vacated Gantt's sentence but remanded only for resentencing. On appeal from the resentencing proceeding, Gantt argued that the State was required to refile notice of its intent to seek a mandatory sentence under former Article 27, section 643B(c) of the Maryland Code. We rejected this argument, holding that "[t]he first sentencing, the successful appeal therefrom, and the resentencing were all one continuing procedural phenomenon" and thus the State was not required to refile notice. *Id.* at 704, 536 A.2d 135. Referring to the five stages of a criminal proceedings, we explained that "[i]t was at [the] fifth stage alone that error occurred [and] ... [t]he remand appropriately required that that stage be repeated." *Id.* Accordingly, it was unnecessary to repeat the filing of notice just as it was unnecessary to repeat "any or all of the first three stages of the criminal proceeding, all of which, like the fourth, were free from error." *Id.*

Our reasoning in *Hammersla* is equally applicable to the demand requirement in this case. When the appellant's first trial ended in a mistrial on the count of possession with intent to distribute, the case "began anew procedurally" because "it returned to the stage at which pretrial motions could be filed and resolved." Indeed, excepting the filing of the indictment, the retrial was in every sense a new "criminal proceeding"— the appellant entered a new not-guilty plea, he was again advised of his right to counsel, new/supplemental discovery requests were filed (by the appellant), a new jury was sworn, *et. cetera*. Thus, under a reasonable, common sense interpretation of the statute, *see, e.g., Smack v. Dep't of Health & Mental Hygiene*, 378 Md. 298, 305, 835 A.2d 1175 (2003) (stating that statutes "must be given a reasonable interpretation, 'not one that is illogical or incompatible with common sense' " (citations omitted)), the appellant was required to file a new demand to compel the appearance of the chemist at his retrial, just as the State in *Hammersla* was required to file a new notice of its intent to seek life imprisonment without parole.[24]

The appellant finally argues that, even if a new demand ordinarily would have to be filed, it was not required here because the chemist was listed on the State's witness list. The appellant claims that he was entitled to rely upon that list, and that he was "actively misled" by the fact that the State listed the chemist as a witness, yet failed to inform him that it did not intend to call her to testify. Because the appellant has raised this argument for the first time on appeal, and it was

---

24. The appellant argues that if the case "began anew procedurally," then the State was required to again fulfill its obligation under CJP section 10–1003(a)(3) "to mail[ ], deliver[ ], or ma[k]e available [the report] to counsel for the defendant or to the defendant personally when the defendant is not represented by counsel, at least 10 days prior to [its] introduction . . . at trial." Although the appellant argues that the State failed to meet its obligation because it "never sent" the report to his second trial counsel, the statute requires only that the report be "made available to counsel." The appellant has given no indication that the report was not available to him prior to his retrial.

**134**

neither raised in nor decided by the circuit court, he has failed to preserve it for appellate review. Md. Rule 8–131(a).

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**